```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS
 2

 3       UNITED STATES OF AMERICA,            )
                                              )
 4                    Plaintiff               )
                                              )
 5            -VS-                             )  Criminal No. 23-10094-PBS
                                              )  Pages 1 - 23
 6       AMY WINSLOW,                          )
                                              )
 7                    Defendant               )

 8                             RULE 11 HEARING

 9

10               BEFORE THE HONORABLE PATTI B. SARIS
                     UNITED STATES DISTRICT JUDGE
11

12

13
                                 United States District Court
14                               1 Courthouse Way, Courtroom 19
                                 Boston, Massachusetts  02210
15                               March 10, 2025, 9:14 a.m.

16

17

18

19

20

21
                            LEE A. MARZILLI
22                        OFFICIAL COURT REPORTER
                       United States District Court
23                     1 Courthouse Way, Room 7200
                          Boston, MA  02210
24                       leemarz47@gmail.com

25
```

1    A P P E A R A N C E S:

2        JAMES D. HERBERT, ESQ., KELLY BEGG LAWRENCE, ESQ., and
     LESLIE WRIGHT, ESQ., Assistant United States Attorneys,
3    Office of the United States Attorney, 1 Courthouse Way,
     Room 9200, Boston, Massachusetts, 02210, for the Plaintiff.
4
         WILLIAM J. TRACH, ESQ. and NATHAN ANDREW FIELD SANDALS, ESQ.
5    Latham & Watkins LLP, John Hancock Tower, 27th Floor,
     200 Clarendon Street, Boston, Massachusetts, 02116, for the
6    Defendant Amy Winslow.

7        TERRA REYNOLDS, ESQ. and NATALIE DeLAVE, ESQ.,
     Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800,
8    Chicago, Illinois, 60611, for the Defendant Amy Winslow.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2          THE CLERK:  Court calls Criminal Action 23-10094,

 3   United States v. Amy Winslow.  Could counsel please identify

 4   themselves.

 5          MS. LAWRENCE:  Good morning, your Honor.  Kelly

 6   Lawrence, Leslie Wright, and Jamie Herbert for the government.

 7          THE COURT:  Thank you.

 8          MR. TRACH:  Good morning, your Honor.  BJ Trach, Terra

 9   Reynolds, Nathan Sandals, and Natalie DeLave on behalf of

10   Ms. Winslow.

11          THE COURT:  Why are we here today, sir?

12          MR. TRACH:  For a plea hearing, your Honor.

13          THE CLERK:  Ms. Winslow, you can remain standing.  Can

14   you just raise your right hand.

15          (Defendant duly sworn.)

16          THE CLERK:  Ms. Winslow, as to Count 6, introduction

17   of misbranded devices into interstate commerce, all in

18   violation of Title 21, U.S.C., Section 331(a) and 333(a)(2),

19   how do you plead to this count, guilty or not guilty?

20          THE DEFENDANT:  Guilty.

21          THE CLERK:  You can take a seat at the witness stand

22   with your counsel.

23          (Defendant takes the witness stand.)

24          THE COURT:  Good morning.

25          THE DEFENDANT:  Good morning.
</pre>

1            THE COURT:  Do you understand you're now under oath,

2      and if you answer any of my questions falsely, your answers can

3      be used against you in another prosecution for perjury or

4      making a false statement?

5            THE DEFENDANT:  Yes, I do.

6            THE COURT:  Now, I couldn't hear that, so --

7            THE DEFENDANT:  Yes, I do.

8            THE COURT:  All right, you know, is the mic picking

9      you up?  There we go, okay.  Now, for that matter, your lawyer

10     is standing right next to you, and at any point, if you want to

11     just sort of say, you know, "Hold it," you can talk to your

12     lawyer.  Do you understand that?

13           THE DEFENDANT:  Yes.

14           THE COURT:  And for that matter, you can at any point

15     say, "I don't want to do this, I want my day in court," because

16     you're scheduled for a few weeks from now, April 7 I think it

17     is.  So at any point you can just say, "I don't want to plead."

18     Do you understand?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Do you understand that you're under oath,

21     and your answers can be used against you, as I just said?  And

22     so let's go through the colloquy right now.  What is your full

23     name?

24           THE DEFENDANT:  Amy Morse Winslow.

25           THE COURT:  See, that's somehow not picking up very

1    well.

2              THE DEFENDANT:  Amy Morse Winslow.

3              THE COURT:  Do you go by any other names or nicknames

4    or anything?

5              THE DEFENDANT:  No.

6              THE COURT:  Where were you born?

7              THE DEFENDANT:  Fayetteville, North Carolina.

8              THE COURT:  And where did you go to school?

9              THE DEFENDANT:  Undergraduate at Brown University and

10   graduate at Harvard Business School.

11             THE COURT:  Were you born in this country?

12             THE DEFENDANT:  Yes.

13             THE COURT:  And at this point, have you ever been

14   treated for any mental health issue?

15             THE DEFENDANT:  No.

16             THE COURT:  Have you ever been treated for any drug

17   addiction?

18             THE DEFENDANT:  No.

19             THE COURT:  How do you feel physically?  I know it's

20   not the best day of your life.

21             THE DEFENDANT:  Okay.

22             THE COURT:  But physically you're feeling all right?

23             THE DEFENDANT:  Uh-huh.

24             THE COURT:  Have you had a chance to go through the

25   plea agreement with your lawyer?

1          THE DEFENDANT:  I have.

2          THE COURT:  And I think you've been here for most, if

3    not all, of the proceedings.  Do you feel as if you've had

4    enough time to talk to your lawyers?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Do you feel as if they're acting in your

7    best interest?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you feel in any way as if they're

10   pressuring you into pleading guilty?

11         THE DEFENDANT:  No.

12         THE COURT:  Has anyone made any promises other than

13   the promises in the plea agreement that I have?

14         THE DEFENDANT:  No.

15         THE COURT:  Have you signed the plea agreement?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Are there any promises among counsel?

18         MS. LAWRENCE:  No, your Honor.

19         MR. TRACH:  No, your Honor.

20         THE COURT:  Do you understand that I'm not going to go

21   through every single line of all this fine print in these

22   paragraphs, but I do want to spend a little bit of time on the

23   waiver of appellate rights and challenges to conviction and

24   sentence?  As I believe, you've basically given up all rights

25   to appeal or challenge the sentence.  Do you understand that?

1              THE DEFENDANT:  Yes, I do.

2              THE COURT:  The two exceptions would be if you find

3     that your attorneys were ineffective or if there was

4     prosecutorial misconduct or misconduct by a government law

5     enforcement agent.  Do you understand that?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Obviously this is your signature at the

8     back of this, right?

9              THE DEFENDANT:  Uh-huh.

10             THE COURT:  And you've had time to go through this

11    with your attorneys?

12             THE DEFENDANT:  I did, yes.

13             THE COURT:  Go through what the penalties would be.

14             MS. LAWRENCE:  Yes, your Honor.  Maximum penalties for

15    Count 6 of the indictment are three years incarceration,

16    supervised release for one year, a fine of $10,000, and a

17    mandatory special assessment of $100.  There's no forfeiture

18    allegation, and restitution is not applicable for this offense.

19             THE COURT:  All right, and what are the sentencing

20    Guidelines for Count 6?

21             MS. LAWRENCE:  So there are two different sentencing

22    Guidelines.  The government's calculation would result in an

23    offense level of 29, which is a Guideline range of 87 to 108

24    months.  The defendant's Guideline calculation would result in

25    an offense level of 2, which would be a Guideline sentencing

1    range of zero to six months.

2            THE COURT:  All right, and is that a debate we'll have

3    at the sentencing hearing?

4            MS. LAWRENCE:  The government's sentencing

5    recommendation is 12 months and a day, so I don't believe there

6    will be a debate, but, yes, we'll have to resolve that before

7    we proceed to the government's recommendation.

8            THE COURT:  All right, it's quite a reduction.  I

9    mean, it's a difference in the calculation.  I know this came

10   up with Mr. Maleknia -- was it Mr. Maleknia as well?

11           MS. LAWRENCE:  That is correct.  The government views

12   the Guidelines as referring to the fraud Guideline, which

13   carries a higher offense level and different enhancements, and

14   the defense calculation would not cross-reference to the fraud

15   guideline, which results in --

16           THE COURT:  So that would be the common question?

17           MS. LAWRENCE:  Yes, to both, both defendants,

18   Mr. Maleknia and Ms. Winslow.

19           THE COURT:  Do you agree with that discussion?

20           MR. TRACH:  Yes, your Honor.  Obviously the Guidelines

21   range as calculated by the government is far above even the

22   statutory maximum in this case, so it's not going to be

23   applicable, but obviously your Honor has an obligation to

24   calculate the Guidelines range as a matter of law, and we will

25   have a dispute over whether it's appropriate to cross-reference

1   the fraud Guidelines.

2           THE COURT:  All right, thank you.

3           So do you understand there will be a debate at a

4   sentencing hearing?  Do you understand that?

5           THE DEFENDANT:  Yes, I do.

6           THE COURT:  And regardless, the government has bound

7   itself to recommend 12 months and a day.  Do you understand

8   that?

9           THE DEFENDANT:  Yes, I do.

10          THE COURT:  Do you understand that I will send this to

11  Probation?  We don't know yet how Probation will calculate the

12  Guideline range.  I imagine they'll be in the middle of this,

13  but ultimately it will be my call.  Do you understand that?

14          THE DEFENDANT:  Yes, I do.

15          THE COURT:  And I may or may not follow the plea

16  agreement recommendation of 12 months and a day, but I will

17  give due weight to the government's recommendation; and my

18  guess, almost certainty, that your attorneys will have a

19  different recommendation.  Do you understand that?

20          THE DEFENDANT:  Yes, I do.

21          THE COURT:  And at the end of that process I will

22  impose a sentence, and you will have the right -- you've

23  basically given up all rights to appeal the sentence, with the

24  exception of those things I mentioned, ineffective assistance

25  of counsel, prosecutorial misconduct.  Do you understand that?

1          THE DEFENDANT:  Yes, I do.

2          THE COURT:  I'm assuming, and maybe I shouldn't, you

3    have no criminal history.  Is that right?

4          THE DEFENDANT:  Correct.

5          THE COURT:  So this will have certain impacts on you.

6    You'll lose the right to vote, to hold public office, to serve

7    on juries.  I imagine there are certain licenses that you might

8    not be able to hold for a certain period of time with a felony

9    conviction, and all sorts of other collateral impacts that I

10   can't even estimate.  Do you understand that?

11         THE DEFENDANT:  Yes.

12         THE COURT:  All right.  I also want to go through in

13   detail the rights you're giving up by pleading guilty.  You're

14   well-educated, so I know you know most of these rights, but I

15   do need to go through them.  Do you understand you have a right

16   to a jury trial?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Do you understand the jury is chosen at

19   random from the community?

20         THE DEFENDANT:  Yes.

21         THE COURT:  And do you understand twelve out of twelve

22   jurors have to decide you're guilty beyond a reasonable doubt

23   before you can be convicted?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Do you understand the government bears the

1  burden of proof beyond a reasonable doubt and it never shifts

2  to you?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Do you understand you have the presumption

5  of innocence?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Do you understand that your attorneys can

8  cross-examine the government witnesses -- you saw some of that

9  at the *Daubert* hearings, et cetera.

10          THE DEFENDANT:  Yes.

11          THE COURT:  They have the right to cross-examine all

12  the witnesses in front of the jury.  Do you understand that?

13          THE DEFENDANT:  Yes.

14          THE COURT:  And in addition, you can subpoena

15  witnesses on your own behalf.  Do you understand that?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Do you understand you don't have to

18  testify against yourself, but you could testify on your own

19  behalf if you chose to do so?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Do you understand that?  And understanding

22  all these very important rights -- I always like to emphasize

23  that trial by jury because it's quite a steep burden that the

24  government has, and they have to have a unanimous verdict, and

25  you're giving up that right.  Do you understand that?

1          THE DEFENDANT:  I do.

2          THE COURT:  So at this point I'm going to ask the

3    government to state the evidence.  I'm trying to understand why

4    the difference -- the different roles the different people

5    played in this and how you came up to this Guideline calculation.

6          MS. LAWRENCE:  I'm sorry.  Calculation of the

7    Guideline range?

8          THE COURT:  Well, I'm just trying to understand it a

9    little better.

10          MS. LAWRENCE:  In what respect, your Honor?  I'm

11    sorry.

12          THE COURT:  Are they the same Guidelines as

13    Mr. Maleknia?

14          MS. LAWRENCE:  Yes, yes.  Yes, they are.  So in a

15    short form, the offense of conviction, the FDCA offense that

16    Ms. Winslow has pleaded to and Mr. Maleknia has pleaded to

17    cross-reference or starts with a certain provision of the

18    Guideline, 2N2.1, that applies to that offense.  That Guideline

19    states that if the offense involved fraud, then it would

20    cross-reference to the fraud Guideline at 2B1.1.  And that

21    Guideline, as you know, the base offense level is determined by

22    the amount of loss or gain as a result of the fraud.

23          THE COURT:  I don't mean the Guidelines.  You're

24    viewing them -- the recommendations are different.

25          MS. LAWRENCE:  The recommendations are the same for

1  Ms. Winslow and Mr. Maleknia in terms of our sentencing

2  recommendation in the plea agreement.

3          THE COURT:  Did you give -- anyway, we can deal with

4  this at sentencing, but, all right, go ahead.

5          MS. LAWRENCE:  Your Honor, if this case were to

6  proceed to trial, the government would present evidence showing

7  that Magellan Diagnostics was a medical device company that

8  sold devices for detecting blood lead levels.  The defendant,

9  Amy Winslow, was Magellan's President from approximately 2011

10  to 2018 and the company's Chief Executive Officer from 2013 to

11  2018.

12          Beginning in November 2012, Magellan sought clearance

13  from the FDA to introduce into the market the LeadCare Ultra

14  device.  In connection with the LeadCare Ultra clearance

15  process, while conducting a study at the FDA's request,

16  Magellan identified an issue which in certain circumstances

17  tended to result in lower blood lead levels when a blood sample

18  was tested shortly after it was mixed with treatment reagent,

19  and higher blood lead levels when the treatment blood/reagent

20  mixture was tested after sitting or incubating for a period of

21  hours or days.

22          After the FDA cleared the LeadCare Ultra in August,

23  2013, but before Magellan first shipped the LeadCare Ultra in

24  December, 2013, the company conducted additional studies, some

25  of which showed some low results.  The defendant was aware of

1    certain of these studies and the results.  Neither the

2    defendant nor any other Magellan employee notified the FDA or

3    Magellan's customers at that time about any such study or

4    results.

5         When Magellan released the LeadCare Ultra device for

6    sale in December, 2013, it did so with the label and

7    instructions for use that allowed for immediate testing upon

8    mixing the blood sample and treatment reagent.

9         Beginning in August, 2014, certain LeadCare Ultra

10   customers reported to Magellan that they had observed

11   unexpectedly low test results when blood samples were tested

12   immediately after being mixed with treatment reagent.

13        In response, in November, 2014, Magellan sent LeadCare

14   Ultra customers a letter advising them to allow the blood

15   sample/treatment reagent mixture to incubate for a minimum of

16   24 hours before testing, which was inconsistent with the

17   device's label.

18        The defendant was aware of these customer complaints

19   and edited and approved the customer letter.  Neither the

20   defendant nor any other Magellan employee notified the FDA

21   90 days prior to sending the customer letter advising LeadCare

22   Ultra's users to utilize 24-hour incubation, and Magellan did

23   not file a notice of correction with the FDA as required.

24        In August of 2015, Magellan internally approved a

25   change to the LeadCare Ultra label to incorporate the 24-hour

1 incubation instruction that the company had previously provided

2 in a November of 2014 customer letter which was sent in

3 response to the customer complaints.

4   The defendant was aware of the label change.  However,

5 neither the defendant nor any other Magellan employee notified

6 the FDA 90 days prior to making the label change and did not

7 file a notice of correction with the FDA, as is required.

8   THE COURT:  So I know you're reading the statement

9 there, so what is it that you're saying she did wrong?

10   MS. LAWRENCE:  We're saying that the defendant knew

11 that they were changing the instruction for the LeadCare Ultra

12 device; and to change an instruction to require the 24-hour

13 incubation, the FDA required 90 days' notice in advance of that

14 change.  And when the change is made, the FDA also requires

15 that a notice of correction be filed.  And the defendant knew

16 that the change was being made and knew that she was required

17 or caused to require the company to file those documents and

18 submissions with the FDA, and that that was material to the

19 FDA.

20   THE COURT:  Do you disagree with anything the

21 government said?

22   THE DEFENDANT:  No.

23   THE COURT:  All right, so --

24   MR. TRACH:  Your Honor, if I may, I would just like

25 to, at least from our perspective, state a few additional

1   facts.  As you know, 21 U.S.C. 333(a)(2), which is what the

2   defendant has pled guilty under, requires that the conduct be

3   done with either the intent to defraud or mislead.  As the plea

4   agreement states, the defendant is admitting to this "with the

5   intent to mislead," and I would just like to read the facts

6   that we think would show in order to create a factual basis for

7   that, if I could.

8          THE COURT:  Well, it will make me suss out whether or

9   not there's enough to support the plea.

10          MR. TRACH:  That was the purpose.

11          THE COURT:  Well, do you want me to reject the plea?

12          MR. TRACH:  No.  I just want to state a factual basis

13   for that portion of the guilty plea, your Honor.

14          THE COURT:  Well, she has to plead guilty with intent

15   to defraud or mislead, right?

16          MR. TRACH:  Correct, and as the plea agreement states,

17   she's pleading guilty with the intent to mislead.

18          THE COURT:  Well, you can say whatever you want to say.

19          MR. TRACH:  Okay, thank you.

20          THE COURT:  But you run the risk, though, I'm going to

21   say we're going to trial.

22          MR. TRACH:  I understand, your Honor, and she has pled

23   guilty, but I think your Honor has to have a factual basis for

24   that, and we just wanted to state the factual basis.

25          THE COURT:  Well, just obviously you'll, as you always

1   do, listen carefully because I don't want to take a plea that's

2   not supported by the facts because I can see a debate here on

3   "with intent to," not on the core historic basic facts but on

4   what her state of mind was, and I'll ask her that.

5            MR. TRACH:  Your Honor, based on prior discussions

6   Ms. Winslow had with Magellan personnel and consultants,

7   Ms. Winslow knew that most substantive changes to the labels on

8   Magellan's devices were subject to FDA approval.  Ms. Winslow

9   did not take steps to determine whether the November, 2014

10  customer letter constituted a label change for LeadCare Ultra.

11  When Magellan changed the LeadCare Ultra label in August, 2015,

12  Ms. Winslow was in a position to cause, and did not cause,

13  Magellan to notify the FDA through the 510K process 90 days

14  before making the label change, nor did she cause Magellan to

15  file a notice of correction with the FDA.

16            Based on her prior discussions with Magellan personnel

17  and consultants, Ms. Winslow was aware that the FDA relied upon

18  510K and notice of device correction filings in performing its

19  regulatory functions, and that there was a high probability

20  that the agency could be misled if a regulated medical device

21  company failed to make those filings as required.  Ms. Winslow

22  deliberately avoided confirming whether the FDA would be misled

23  by the company's failure to notify the agency about the August,

24  2015 label change.  The company filed a special 510K with the

25  FDA in March, 2017, in which it notified the agency of the

August, 2015 label change.

THE COURT:  Do you agree with what Mr. Trach just said?

THE DEFENDANT:  Yes.

THE COURT:  Did you have the intent to mislead the FDA?

THE DEFENDANT:  Yes.

THE COURT:  All right, anything you want to add here?

(Discussion between government attorneys.)

MS. LAWRENCE:  No, your Honor.

THE COURT:  Thank you.  So I'm reading now from Count 6.  Do you plead guilty from in or around November, 2014, through in or around December, 2017, within the District of Massachusetts and elsewhere, that you together with Mr. Maleknia and Ms. Daoust, with the intent to defraud and mislead -- I suppose the "and" here is "or" mislead -- with the intent to mislead, caused to be introduced into interstate commerce misbranded medical devices -- to wit, the LeadCare Ultra, which was distributed to customers outside Massachusetts -- with instructions to incubate the blood-treated reagent samples for 24 hours, even though the defendants failed to provide the FDA premarket notification at least 90 days before distributing a significantly changed device, pursuant to 21 CFR Part 807; and, two, the defendants did not file the necessary reports of device correction

1    initiated to reduce a risk to health posed by the device,

2    pursuant to 21 U.S.C. Section 360(i)(G), and 21 CFR Part 806,

3    all in violation of 21 U.S. Code, Section 331(a) and 333(a)(2)?

4    do you plead guilty knowingly, freely, and voluntarily?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Anything else anyone wants to say before I

7    accept this plea?

8            MR. TRACH:  No, your Honor.

9            THE COURT:  I find the plea is knowing and voluntary,

10   supported by an independent basis in fact concerning each of

11   the essential elements, and I accept it.  You can step down.

12   Thank you.

13           (Defendant returns to counsel table.)

14           THE COURT:  So the concern I have here is, I do think

15   that there is an overarching issue that affects -- is it just

16   Mr. Maleknia and Ms. Winslow?

17           MS. LAWRENCE:  An overarching issue affecting --

18           THE COURT:  What Guidelines apply, that applies to

19   both of them?

20           MS. LAWRENCE:  Our position is, it would apply to both

21   of them, as the government's calculation as set forth in the

22   plea agreements to each defendant would --

23           THE COURT:  I'm just trying to figure out whether I --

24   in other words, I don't want to make a ruling with respect to

25   one and -- what applies to one would apply to both?  Is the

1    sentencing on the same day?

2          MS. LAWRENCE:  That would be fine for us, or that if

3    Probation were able to complete the PSRs for both defendants at

4    least at the same time, then you would know what Probation's

5    position is as to both.

6          THE COURT:  Have you already got a date, Mem?

7          THE CLERK:  Yes.  So Mr. Maleknia, he is scheduled for

8    June 26.  I was scheduling Ms. Winslow, after I talked to

9    counsel, to July 23.  Do you want me to have them the same day?

10          THE COURT:  Well, it means I'm resolving basically the

11    legal matter for one before I hear from the other.

12          MR. TRACH:  Well, I think that is fine, your Honor.  I

13    do think there are at least some potential differences here,

14    and that Ms. Winslow pled guilty to one of the two counts,

15    Count 6 alone, and Mr. Maleknia pled guilty to Counts 5 and 6.

16          THE COURT:  That's fair enough in terms of what the

17    sentence is, but the core issue of what Guideline applies is

18    going to be the same, so what I do for Mr. Maleknia I'm likely

19    to do for her.

20          I tell you what.  I think we should probably do them

21    simultaneously, really.  I need to rule on the legal issue

22    after hearing from both of them.  Don't you think?  I mean --

23          MS. LAWRENCE:  That would be our preference, your

24    Honor.

25          THE COURT:  So I could do part one of hers and then do

1    part two later on.  When?

2         THE CLERK:  On Thursday, June 26 -- it's the week

3    before July 4th -- at 2:30 because in the morning there's a

4    suppression hearing.  So we have Maleknia at 2:30.

5         THE COURT:  Well, why don't we do this:  We're going

6    to stay with Maleknia; we're not going to change that date.  I

7    am open to -- and maybe counsel should talk or whatever -- I'm

8    open to at least doing the discussion of the Guidelines

9    simultaneously.

10         MR. TRACH:  We are happy both to brief that issue and

11    to come and argue it at Mr. Maleknia's sentencing, if that's

12    what your Honor would prefer.

13         THE COURT:  What do you think?  And then we could just

14    do the sentencing separately, because as I was inartfully

15    saying before, I don't quite understand why the recommendation

16    for Mr. Maleknia is higher than the one for Ms. Winslow.

17         MS. LAWRENCE:  I think I understand how to answer that

18    question.  The reason Mr. Maleknia's total offense level was 31

19    and Ms. Winslow's is 29 is due to the loss caused by the

20    conduct.  So in the government's view, the fraud Guideline is

21    derived from the loss or gain.  Mr. Maleknia pled guilty to two

22    counts.  One of those counts, Count 5, involved the LeadCare II

23    device, and Count 6 only involves the LeadCare Ultra device.

24    And the amount of revenue gained by the company for LeadCare II

25    applies to Mr. Maleknia, but it does not apply to Ms. Winslow,

1    so there's a lower loss amount that results in a lower offense

2    level.

3           THE COURT:  I see.  Yes, that's what I -- I didn't ask

4    it well.  But I do think that in a way -- this drives me nuts.

5    I just had this happen in another case where the Guidelines,

6    I'm supposed to calculate them.  I have another one coming up

7    this week, very difficult Guideline issues, but it doesn't

8    matter because the government has agreed to a different

9    sentence.  So, I mean, I'm not here sort of to do advisory

10   issues on difficult issues, but I'm increasingly being asked to

11   do that.

12          But, in any event, I think that's an issue for another

13   day.  So I've accepted this.  The same bail conditions, and I

14   think that's basically -- is there anything else I need to

15   worry about?

16          MR. TRACH:  So, no, your Honor.  There is one condition

17   of pretrial release that we would ask that your Honor modify.

18   The one condition of pretrial release, there is a very long

19   list of potential witnesses in the trial that Ms. Winslow is

20   not permitted to speak to.  I think, now that the plea has been

21   taken, if we could remove that condition of release.  I've

22   talked to the government.  They have no objection.

23          THE COURT:  Sure.

24          THE CLERK:  What about Pretrial?  They're not here.

25          THE COURT:  Yes, I guess if you could -- the Pretrial

1    officers aren't here, so someone is going to have to transmit

2    that message.  And if there's an issue, I can issue an order,

3    but I don't have a problem --

4         MR. TRACH:  I'm happy to do that, your Honor.

5         THE COURT:  All right, okay.  Ms. Molloy pointed that

6    out.

7         Okay, we have a huge case.  They're not here for you.

8    It's the well-known eBay case is coming up next, so we're going

9    to take a quick break so you can switch out, and obviously

10   we're not going to trial on April 7.

11        THE CLERK:  And keep the 23rd?

12        THE COURT:  Keep the 23rd as the date.

13        MR. TRACH:  Your Honor, I just wanted to express my

14   appreciation to the Court and to the Clerk for accommodating us

15   at the last minute so early on Monday morning.

16        THE COURT:  It's better for us than doing it the

17   Friday night before the trial, which is what happened to us the

18   last month.  So we can let Mr. MacAlear know not to bring in

19   hundreds of extra jurors, which is what we -- I think we had a

20   couple of hundred extra people coming in.

21        THE CLERK:  We did.

22        THE COURT:  So, all right, we'll stand in recess.

23   Thank you.

24        THE CLERK:  All rise.

25        (Adjourned, 9:40 a.m.)

1                  C E R T I F I C A T E

2

3
UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )
5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 23 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Criminal No. 23-10094-PBS,

11  United States of America v. Amy Winslow, and thereafter by me

12  reduced to typewriting and is a true and accurate record of the

13  proceedings.

14           Dated this 17th day of March, 2025.

15

16

17

18

19
                   /s/ Lee A. Marzilli
20           _____
                   LEE A. MARZILLI, CRR
21                 OFFICIAL COURT REPORTER

22

23

24

25