# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| *v.* | Case No. 1:23-cr-10094-PBS |
| AMY WINSLOW,<br>MOHAMMAD HOSSEIN MALEKNIA, and<br>REBA DAOUST, | |
| *Defendants.* | |

## DEFENDANT AMY WINSLOW'S
## <u>SENTENCING MEMORANDUM</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     AMY WINSLOW'S PERSONAL HISTORY AND CHARACTER ...............................2

     A.     Amy's Background .............................................................................................2
     B.     Amy's Path to Magellan ....................................................................................3
     C.     Amy Takes on the Role of President at Magellan ..............................................5
     D.     Amy's Approach to Management .......................................................................7
     E.     The Relevant Conduct to Amy's Offense: LeadCare Ultra Customer
          Concerns and Resulting Label Change ...............................................................9
          1.     What Amy Did Not Do .........................................................................15
     F.     Amy's Guilty Plea ...........................................................................................16
     G.     The Collateral Consequences Amy Has Suffered Since the Indictment .............19
     H.     The Person Amy Truly Is .................................................................................21

III.    ADVISORY GUIDELINES CALCULATION ...............................................................22

     A.     The Government Has Not Put Forth Any Evidence in Support of Its
          Enhancements ..................................................................................................23
     B.     Enhancements Under § 2B1.1 Do Not Apply ...................................................24
          1.     There Was No Loss Under § 2B1.1 ......................................................24
               a.     Commentary Note 3(E)(v) Does Not Apply ..............................27
          2.     There Were No Victims Under § 2B1.1 ................................................29
          3.     There Was No Risk of Death or Serious Bodily Injury Under
               § 2B1.1 ...............................................................................................30
     C.     The § 3B1.1(a) Adjustment For Role in the Offense Does Not Apply ...............31
     D.     Amy is Entitled to a Two-Point Decrease Under U.S.S.G. § 4C1.1 ...................34
     E.     Amy's Total Offense Level is 2 ........................................................................34

IV.     APPLICATION OF THE 18 U.S.C. § 3553(A) FACTORS .............................................34

     A.     Nature of the Offense and Characteristics of Amy ...........................................35
          1.     The Nature of the Offense ....................................................................35
          2.     The Nature of the Offender ...................................................................35
     B.     Amy's Proposed Sentence Provides a Just and Adequate Punishment for
          the Offense .....................................................................................................38
     C.     A Sentence Other than Incarceration is Appropriate .........................................41
     D.     The Government's Proposed Sentences Create a Sentencing Disparity
          With Other Culpable Parties .............................................................................42
     E.     No Restitution Is Due .......................................................................................45

V.      CONCLUSION ...............................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Gall v. United States*,
   552 U.S. 38 (2007) ................................................................................................34, 35

*United States v. Alli*,
   444 F.3d 34 (1st Cir. 2006) ................................................................................................25

*United States v. Andujar-Colon*,
   43 F.4th 226 (1st Cir. 2022) ................................................................................................22

*United States v. Bane*,
   720 F.3d 818 (11th Cir. 2013) ................................................................................................27

*United States v. Bishoff*,
   58 F.4th 18 (1st Cir. 2023) ................................................................................................44

*United States v. Blanc*,
   146 F.3d 847 (11th Cir. 1998) ................................................................................................18

*United States v. Cadden*,
   965 F.3d 1 (1st Cir. 2020) ................................................................................................29

*United States v. Chin*,
   41 F.4th 16 (1st Cir. 2022) ................................................................................................30

*United States v. Dorvee*,
   616 F.3d 174 (2d Cir. 2010) ................................................................................................35

*United States v. Flores-Gonzalez*,
   86 F.4th 399 (1st Cir. 2023), cert. denied, 145 S. Ct. 181 (2024) ....................................34, 42

*United States v. Herlihy*,
   336 F.R.D. 217 (D.N.M. 2020) ................................................................................................17

*United States v. Kabouni*,
   641 F. App'x 6 (1st Cir. 2016) ................................................................................................31

*United States v. Lucien*,
   347 F.3d 45 (2d Cir. 2003) ................................................................................................30

*United States v. Ofray-Campos*,
   534 F.3d 1 (1st Cir. 2008) ................................................................................................33

*United States v. Prigmore*,
   1996 WL 464030 (D. Mass. Aug. 7, 1996) .........................................................26

## STATUTES

18 U.S.C.
   § 3553...................................................................................................................21
   § 3553(a).......................................................................................................*passim*
   § 3553(a)(3)-(4)....................................................................................................41

21 U.S.C.
   § 331.....................................................................................................................16
   § 333(a)(2)............................................................................................................16

28 U.S.C. § 994 (j) ..................................................................................................40

U.S.S.G.
   § 2B1.1.................................................................................24, 29, 30, 43
   § 2B1.1(16)(A)..........................................................................................30, 31
   § 2B1.1(b)(1).............................................................................................25, 29
   § 2B1.1(b)(1)(C)(i)...........................................................................................29
   § 2B1.1(b)(2)(A)(i)...........................................................................................29
   § 2B1.1, cmt. no. 3(E)(v).................................................................................27
   § 2B1.1, cmt. no. 1...........................................................................................29
   § 2B1.1 cmt. no. 21(C).....................................................................................38
   § 3B1.1.................................................................................................................34
   § 3B1.1(a)............................................................................................................31
   § 3B1.1 cmt. no. 4.............................................................................................32
   § 4C1.1.........................................................................................................34, 41
   § 4C1.1(a)(1)-(11)..............................................................................................34
   § 5C1.1(b).....................................................................................................34, 41
   § 5C1.1(c)(3)......................................................................................................41
   § 5C1.1, cmt. no. 10..........................................................................................41
   § 5G1.1.........................................................................................................22, 41
   § 5K2.20.............................................................................................................38

## OTHER AUTHORITIES

*Class 1 Device Recall LeadCare Blood Testing System*, U.S. Food & Drug
   Admin., June 5, 2017,
   https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=155436 .....................16

*Three Former Executives for Magellan Diagnostics Plead Guilty to False
   Statements and FDCA Violations*, U.S. Att'y Office: Dist. of Mass., March 11,
   2025, https://www.justice.gov/usao-ma/pr/three-former-executives-magellan-
   diagnostics-plead-guilty-false-statements-and-fdca .....................20, 40

## I.    INTRODUCTION

On March 10, 2025, Amy Winslow entered a guilty plea to a single count of a six-count Indictment charging her with introducing a misbranded medical device into interstate commerce. Dkt. No. 292.  Her crime: a regulatory violation.  She failed to notify the Food and Drug Administration ("FDA") of a label change for LeadCare Ultra within the prescribed regulatory timeframe and through the appropriate regulatory process.  To be clear, FDA was notified of the label change a few months after it happened, but it was unfortunately not done as prescribed by FDA regulations.  Amy acknowledges her fault and regrets her wrongdoing.

Through this submission, Amy seeks to provide the Court with a complete picture of her life and the context for her conduct, so that the Court can better understand how Amy's decisions and actions (or failure thereof) are fundamentally at odds with Amy's character and core values and inconsistent with how she has always lived her life.  As will be made clear below, Amy has already endured consequences well beyond the scope of her admitted wrongdoing.  Since the time of the Indictment, the Government has furthered her hardship by making public statements with claims to which she did not plead guilty and did not commit, irreparably harming her reputation. Amy has also lost a hard-earned career and the opportunity to continue long-standing community service roles that were very important to her.

To date, the parties have not agreed on an appropriate sentence for Amy, and most of the facts alleged by the Government are in dispute, with Probation appropriately deferring to the Court to resolve those disputes.  Despite accepting Amy's narrow guilty plea, the Government is attempting to unfairly shoehorn its unsubstantiated allegations from its Statement of Offense Conduct, Ex. 1, into the relevant conduct the Court should consider at sentencing.  It is recommending a sentence of 12 months and one day of incarceration, a fine of $10,000, 12 months of supervised release, and a mandatory special assessment of $100.  For the reasons set forth below,

Amy respectfully submits that a sentence of time served, 12 months of probation, a fine of $10,000, and a mandatory special assessment of $100, is the only appropriate sentence and is consistent with 18 U.S.C. § 3553(a).

## II.    AMY WINSLOW'S PERSONAL HISTORY AND CHARACTER

### A.    Amy's Background

Amy grew up between Iowa and Chicago to divorced parents.  When Amy was 10, her mother remarried and moved her and her sister to Boston, where her new stepfather lived.  Amy had and continues to have a strong and deeply engaged relationship with her family.

Amy was a dedicated student and excelled in her studies.  After graduating from Noble and Greenough School, she attended Brown University in 1989, graduating in 1993, having studied both biology and French.  Amy knew she wanted to work in the life sciences field because it aligned with her values of helping others.  She also knew she wanted to work on the business side, and that is the path she took, starting immediately after graduating from Brown.  She began working as a marketing manager at C.R. Bard and then took that same position at Genzyme Transgenics.  At that job, Amy met Peter Glick, who became a friend and professional mentor to her.  He encouraged her to further develop her business acumen and pursue business school.  She did so, attending Harvard Business School and graduating in 1999.

Amy met her husband, Edward ("Toffer") Winslow, at Harvard Business School, and they married soon after graduation.  Although she graduated at the height of the "dot-com" boom, Amy knew she wanted to return to the life sciences sector.  Amy took a job managing the new e-commerce function at Athena Diagnostics in Worcester, a diagnostic laboratory that performed specialized neurology tests for physicians and laboratories.  At Athena, she quickly rose through the ranks to become a Vice President ("VP") of Marketing.  Then, in 2003, Amy and her husband had their first child, a daughter, Hadley.  Amy returned to Athena after her maternity leave but

quickly looked for work options that would allow her more flexibility to raise her child.  In 2004, Amy left Athena to do just that, and after a year of doing consulting work for Athena, she began doing periodic consulting projects for other life sciences clients, all focused on marketing and strategy.  Amy's son, Edward ("Nate"), was born in 2005.  Amy maintained a successful and balanced career as a part-time consultant for several years.  In a document she prepared as part of a leadership program she participated in during 2014, Amy described the years she worked as a part-time consultant as "happy... because while not always interesting, and not always lucrative, for the amount of hours I worked, it was good and it allowed me two important things 1) to 'stay in the game' 2) have flexibility to raise my kids, which is really important to me."  Ex. 2 at 2.  Commitment to the well-being of her family and carving out time for community service were important considerations for Amy as she steadily built her career and reputation in her chosen field, ultimately leading to the significant opportunity to advance in her profession as an executive at Magellan Diagnostics ("Magellan" or the "Company").

### B.    Amy's Path to Magellan

While consulting and raising her children, Amy maintained a strong relationship with Peter Glick, who, in addition to continuing to serve as a professional mentor to her, helped her secure consulting assignments for companies with whom he had relationships.  In mid-2011, Glick called Amy and said, "I have a company you should run."  Ex. 2 at 2.  Glick was talking about the LeadCare division of Magellan Biosciences, the corporate precursor to Magellan.  At the time, Amy's primary consulting project entailed functioning as the de facto VP of Marketing at a venture-backed device company.  Ex. 2, *id.*  Glick pitched Magellan's LeadCare unit as "a great little business,... doing well, just needs some professional sales & marketing help to grow.  And, the board is planning to sell soon... it will definitely be sold by April 2013."  *Id.*  Amy had a lot of trepidation about the prospect: both because she had never held such a senior leadership position

before, with her highest full-time position having been VP of Marketing at Athena many years earlier, and because she liked the flexibility of the part-time consulting work she had been doing for almost seven years as her kids were growing up.  But Glick's pitch appealed to Amy's expertise—sales and marketing—career aspiration, and her preference for maintaining professional flexibility though a short-term commitment, given that the Company was likely to be sold within the next two years.

Before Amy joined Magellan, Glick (who was the Company's Executive Chairman) and the Board tasked her with a six-week consulting project: a commercial assessment of the lead testing business.  In those six weeks, Amy learned about LeadCare and decided she liked the Company's product and its mission of helping to protect people, especially children, from lead poisoning.  Magellan's LeadCare product analyzed lead levels in whole blood through an electrochemical method known as Anodic Stripping Voltammetry ("ASV").  Since 2006, Magellan's FDA-approved, pioneering device, the LeadCare II, enabled doctors, for the first time, to screen for lead in their office in just three minutes using only a few drops of blood from a finger prick.

Amy also identified untapped sales and marketing opportunities for Magellan's LeadCare products.  After those six weeks, Amy felt good about the Company and had assurances from Glick that he would be by her side, helping to run Magellan as Executive Chairman.  As Amy described, this dynamic created a compelling opportunity to "run a business with 'training wheels.'" Ex. 2 at 2.  Amy joined Magellan, not as an executive with decades of experience in an FDA-regulated company, but as a marketing professional with limited prior senior executive experience and no operational experience at an FDA-regulated medical device manufacturer.  Amy also had no training in FDA regulation or compliance, in research and development ("R&D"), or in quality

assurance or control.  Acknowledging these gaps, Amy was eager to learn and embraced the opportunity to grow professionally with the support of Glick.  Having worked with Glick closely before, Amy knew she could depend on his broad experience as an executive of regulated companies.  Amy understood her role as a leader was to know her strengths and limitations, and to build and empower her team to leverage their expertise and experience to drive their work and thrive in their respective roles.

### C.    Amy Takes on the Role of President at Magellan

To understand Amy's story in the context of the Court's sentencing determination, it is important for the Court to understand Magellan's story from Amy's perspective, and specifically Magellan's structure and operations when Amy arrived in 2011.  Magellan was owned by a private equity company, Ampersand Capital Partners, and had until recently been operated as part of a conglomerate ("Magellan Biosciences") with two sister companies—Trek and Dynex.  In early 2011, Ampersand sold Trek to ThermoFisher, and when Amy arrived at Magellan, Ampersand was preparing to sell Dynex and Magellan Diagnostics.  In the Magellan Biosciences days, the three sub-companies shared several functions, including regulatory affairs, as well as quality assurance and quality control ("QA/QC").  These functions were functionally housed with Trek and largely vanished when Trek was sold to ThermoFisher.  As a result, when Amy started at Magellan in 2011, Magellan had no regulatory expertise or QA/QC function to speak of.  Among the numerous unexpected challenges she faced, Amy also quickly learned that Magellan's VP of Information Technology was departing, and that the lease the Company held for its corporate headquarters would not be renewed.  Rather than being able to focus on improving sales and marketing, which was her original mandate, as a first-time President, Amy found herself needing to rebuild nearly every function of the Company.

When Amy took over as Magellan's President in late 2011, she faced numerous challenges including re-establishing critical operational functions. Knowing her strengths and her limitations, Amy soon hired trusted professionals to oversee and advise her regarding operations and R&D functions. In early 2012, at Glick's suggestion, Amy brought Hossein Maleknia back to Magellan as Chief Operating Officer ("COO"). Ex. 2 at 3. Maleknia was an engineer with extensive experience in the laboratory instrumentation industry, who had previously worked in Operations at Magellan. Maleknia had knowledge about the LeadCare product and instrumentation, the underlying technology, the manufacturing, and how the R&D team was structured and operated. In early 2013, Amy hired Norm Sheppard as Vice President of R&D. Amy knew and respected Sheppard from work he had performed at one of her consulting clients. Sheppard had a Ph.D. from MIT and more than two decades of experience in biomedical engineering when Amy brought him to Magellan. Amy was keen to hire Sheppard because she knew that she could rely on him to provide steady, thoughtful guidance on the scientific aspects of Magellan's R&D processes. Amy also got to know and build trust in the R&D and product team members who were already at Magellan, including Susan Garramone, Rosemary ("Rose") Feeney, and Robb Morse (though Morse was initially on the product marketing side, he had a strong technical background and understanding). These were the individuals with operational and scientific expertise whom Amy knew to rely on and had to rely on because she had no technical background of her own. As President, she maintained a bird's eye view of the Company but could not be involved in the minute details of every operation, trusting her experienced team to manage those aspects.

Consistent with industry practices, she agreed to have QA/QC and Regulatory Affairs roll up to her, rather than to Operations. Since Amy had no prior regulatory or QA/QC experience, she trusted her team to develop a robust regulatory and quality function at Magellan. At Hossein

Maleknia's recommendation, Magellan hired Reba Leger (Daoust) to oversee QA/QC in addition to the regulatory function of the business. Daoust had strong qualifications, and Amy trusted her to rebuild the company's QA/QC system and fill the shoes of the in-house regulatory compliance head. Magellan also contracted with and primarily relied on external FDA consultants to advise it on regulatory submissions, reporting obligations, and other FDA matters. Amy relied on Daoust to manage the relationship with the consultants and to act upon their advice. She also relied on Daoust and the consultants to educate her as she learned the rigors of FDA regulation.

### D.    Amy's Approach to Management

Amy signed on for a short-term CEO "with training wheels" experience with a focus on sales and marketing to prepare the "little business" for a sale. Ex. 2 at 2. Amy got a company with one great product—LeadCare II—but the Company also needed numerous functions to be rebuilt following the breakup of the larger business. *See id.* Amy took the lead on what she knew—sales and marketing—and she relied on the expertise of colleagues and outside consultants to manage the technical and regulatory aspects of the business. Amy knew that she had to focus on boosting sales of the product that drove nearly all of Magellan's revenue: LeadCare II. In the context of trying to address those immediate priorities with the Company's operations and performance, Amy deferred to Magellan's R&D team to manage the process around the submission of Magellan devices for FDA 510(k) clearance, including the LeadCare Ultra. The LeadCare Ultra device was a new offering from Magellan that used the same underlying ASV technology as the LeadCare II, but was designed for large laboratories, testing multiple samples at a time and detecting lower levels of lead. *See* Ex. 3 (comparing the LeadCare devices). It was expected to be used primarily to test blood drawn from veins ("venous blood"), in contrast to the predominant use for LeadCare II, which was to test blood drawn from a finger prick ("capillary blood"). Amy knew that LeadCare Ultra would never be a major revenue driver for the

Company—it was designed to replace an old lab system that the Company had developed in the early 1990s, and there simply were not many laboratories that had enough volume in blood lead tests that had not already invested in other technologies.  But Amy trusted her team and continued focusing on Company priorities.  After all, Amy was running the entire Company and had multiple areas of focus.  Amy would not have been fulfilling her corporate duties to Magellan if she focused only on LeadCare Ultra, or the various tests and analyses the Magellan R&D team was carrying out over the months and years in which she ran the Company.

Like any good executive, Amy did not micromanage, browbeat, or direct anyone to avoid or shade the facts.  *See, e.g.*, Ex. 4 (July 3, 2013 email from Amy noting that "it all depends on what Gail/Jan/Reba think is the best way to tell our story."); Ex. 5 (July 29, 2013 email from Amy thanking Garramone for "orchestrating" in connection with the LeadCare Ultra's 510(k)).  She had weekly discussions about all aspects of the business with her trusted mentor, advisor, and Magellan's Executive Chairman, Peter Glick, consistent with their arrangement that he would be by her side in helping to run the Company.  *E.g.*, Ex. 6 (June 4, 2013 one-on-one meeting between Amy and Glick to discuss various aspects of the business); Ex. 7 (Oct. 22, 2013 one-on-one meeting between Amy and Glick to discuss same).  She provided resources to her team, such as hiring outside consultants, including regulatory experts and statisticians, that could guide them through complex data analysis and regulatory requirements.  *E.g.*, Ex. 8 at 2 (March 2015 email from Amy asking for the Company's outside statistician to "weigh[] in on the subject of the number of samples we'd need in this study to feel it is statistically valid to support our claim that the LCU incubation is not seen in LCII."); Ex. 9 (April 2015 email from Daoust forwarding Zucker's advice on the LeadCare Plus submission to Amy and others, writing "this is how I would proceed").

Amy did what any company should want a CEO or President to do: she drove the business where she was strongest, and she trusted the experts and followed their guidance on matters where she did not possess the relevant expertise.  Reflecting on her first few years at Magellan, Amy contemporaneously recognized that she did not (and could not) know every detail of every aspect of Magellan's business.

> ○ Personally/emotionally:
> - My first time leading a company – "what am I doing wrong that I don't realize I'm doing wrong?"  I am plagued with self doubt that I know does me no good.
> - Building my own skill set: paying attention to what skills I am gaining that will be valuable in my future career.
> - I struggle emotionally with balancing my career (and the financial benefits that come with it) with being a mother and building the best family I can, really being there for my kids.

Ex. 2 at 4.

\*\*\*

As the Court considers the evidence presented, we urge the Court to assess it through the lens of Amy's specific knowledge, perspective, and experience.  Magellan was Amy's first role as CEO and President.  Amy was not a typical CEO with decades of experience in an FDA-regulated company.  She was specifically recruited for her sales and marketing expertise to prepare the Company for a sale.  Eager to advance her career, Amy embraced the opportunity.  Initially intended as a short-term project, a stepping stone, Magellan became a significant, more than six-year chapter in Amy's life.  The experience brought unexpected challenges, requiring Amy to make difficult decisions.  She also made some wrong decisions, for which she is deeply remorseful.  Amy accepts full responsibility for her failure to comply with the law, as detailed in Sections II.E and II.F *infra*.

### E.    The Relevant Conduct to Amy's Offense: LeadCare Ultra Customer Concerns and Resulting Label Change

LeadCare Ultra was approved by FDA in August 2013, through the 510(k) clearance process.  The 510(k) clearance process allows for a more expedited review of a medical device where the underlying technology is identical to another device that has already been approved by FDA; this was the case for LeadCare Ultra, which utilizes the same technology as LeadCare II, ASV, and which had been approved and had been used for almost a decade without any report of the incubation issue that LeadCare Ultra customers reported beginning in August 2014.  In connection with the regulatory approval process, the Company did extensive testing of the device to prove that it worked as intended, and as LeadCare II had for years.

In connection with the anticipated launch of LeadCare Ultra to customers, the scientists at Magellan did additional quality control testing of the device in July-November of 2013, some of which yielded unexpected results.  Amy relied on the scientists at the Company to conduct any testing they deemed necessary to ensure that the device worked as intended before actually delivering it to customers.  And the scientists did so, concluding in December 2013 that after evaluating several studies conducted during late August through October, incubation "does not change the overall performance of the system" and that "[b]ased on this, NO change to the Package Insert is recommended."  Ex. 10 (December 10, 2013 email from Rose Feeney to Amy, Maleknia, Daoust and others at the Company).  It was only after the lead scientists at the Company determined that the LeadCare Ultra worked without requiring any changes to the instructions that the Company began shipping the device to customers in December 2013.  *Id.*

It is important to highlight that laboratories that purchase and use testing devices such as LeadCare Ultra must be certified and comply with Clinical Laboratory Improvement Amendments ("CLIA") guidelines.  Ex. 11 at 1 (LeadCare Ultra Package Insert).  These guidelines require

laboratories to conduct extensive validation testing before using a new testing device and to perform periodic quality control testing thereafter. *See* Ex. 12 (CMS guidance document on CLIA's requirement to verify a device's performance specifications); *see also* Ex. 13 at 5-1, 5-2 (LeadCare Ultra User's Guide, Quality Control, including CLIA guidelines regarding quality control testing). Such validation can include testing samples using the device and a reference method to ensure that the device works properly before using it to test patient samples. *See* Ex. 12 at 4. Critically, all of the customers who purchased LeadCare Ultra from December 2013 to July 2014 performed such validation testing (as required by their CLIA certification) and their LeadCare Ultra machines worked exactly as intended. *E.g.*, Ex. 14 (announcing that Empire's validation of LeadCare Ultra "passed"); Ex. 15 (confirming that Allina Health "validation studies are complete" and "patient testing" would begin); *see also* Ex. 16 at 5 (February 7, 2014 Board of Directors Meeting presentation stating that LeadCare Ultra was "performing well in field").

Something changed in August of 2014. During that month, two customers who purchased LeadCare Ultra discovered that it was providing inconsistent lead level readings when the same samples were re-tested (specifically observing lower values when the blood sample was tested shortly after mixing with the treatment reagent but higher levels if the mixture was allowed to sit or incubate for some time before testing). When she heard about these reports, Amy was concerned and directed her team to work diligently to understand and address any issues. On August 13, 2014, when Robb Morse, Marketing Director, first alerted Amy to customer complaints with concerns that "results [with LeadCare Ultra] fall both above and below the 'level of concern,'" Amy responded within the hour, "This is concerning. I thought that just this morning Cheryl [Callahan] reported nothing unusual with Ultra customers?" and asked to be kept updated. Ex. 17. Amy was genuinely concerned, she cared about the product and how it served customers and, most

importantly, patients.  Amy deferred to Callahan and her Product Support team to handle the complaints and work with customers.  Amy was not a micro-manager; she trusted her team and offered her help "when/if you want me to jump in."  Ex. 17.  For example, when Morse directly asked Amy for advice on how to address concerns raised by two customers, Sunrise Lab and Sonic Healthcare, Amy responded quickly, asking to have a call "first thing in the morning to strategize" following a meeting where Rose Feeney would present "some results."  Ex. 18.

Amy never thought there was a link between the inconsistent results that customers were reporting and the unexpected results in some internal studies observed in 2013 and early 2014, *see* PSR at 56-60 (Amy's Objections to PSR ¶¶ 19, 21-22, 24), and at the time she did not have the benefit of knowing the incubation issue some customers were experiencing was in fact caused by an unreported change, in direct violation of FDA regulations, that Becton Dickinson ("BD") made to the rubber stoppers of certain of its widely-used venous blood collection tubes.  *See* Ex. 19 (Jan. 11, 2018 FDA Warning Letter to BD); *see also* PSR at ¶¶ 63-68.  These venous blood collection tubes were not sold by Magellan with its LeadCare devices, and therefore not subject to Magellan's oversight.

When customers began raising concerns, while her team of scientists diligently worked on understanding the issue and identifying a solution, Amy sought advice from her internal team, the Executive Chairman and her mentor, Peter Glick, as well as outside regulatory experts on the Company's obligations towards customers and FDA, including outside counsel specialized in FDA regulatory compliance.  E.g., Ex. 20 (redacted Amy's handwritten notes reflecting a Nov. 3, 2014 meeting between Amy and Glick to discuss legal advice regarding the customer concerns).[1]  Based

---

[1] This document is redacted because the Company has asserted privilege over the content of the legal advice sought and received regarding the customer reports.  Amy reserves the right to challenge Magellan's privilege assertion.

on that advice, Magellan drafted and sent a notification letter to inform customers of the issue and recommend what they thought at the time would be a short-term solution, a 24-hour incubation of the blood sample with treatment reagent prior to testing (a mitigation that R&D had vetted and approved). Ex. 21 (November 2014 Customer Letter).

Amy did not author the customer notification letter, but as one of the strongest writers at Magellan, she provided edits—mostly stylistic and clarifying, and not all of which made it to the version sent to customers.[2] *See* Ex. 22 (providing "some of the edits we discussed today" on Oct. 31, 2014), Ex. 23 (providing edits on Nov. 4, 2014); Ex. 24A, 24B (sending final "clean up" edits to the letter on Nov. 25, 2014 to Glick, noting "[w]e shouldn't edit anything that our regulatory advisors would care about"). For example, Amy added the adverb "recently" before "identified cases where the LeadCare Ultra System underestimates the lead concentration..." because she considered the customer-reported incubation issue to be, in fact, recent, only dating back to the customer complaints received in August 2014. Amy understood the letter to be truthful and accurate, vetted by regulatory advisors, and reflecting her and her team's understanding of the issue at the time, when her team had not yet identified the root cause to be the adulterated BD tubes. *See also* PSR at 62-63(Amy's Objections to PSR ¶ 29).

Amy, however, regrets not having taken sufficient steps to determine whether the November 2014 customer letter, Ex. 21, which advised all 49 LeadCare Ultra customers to incubate blood samples with treatment reagent for 24 hours, constituted a label change for

---

[2] Throughout her tenure at Magellan, Amy reviewed and edited all types of documents that came across her desk, from draft FDA filing documents to formal customer notification letters. Like her edits to the November 2014 customer letter, Amy's edits were generally stylistic and clarifying. On the scientific and technical substance, she deferred to her team of experts. *See, e.g.*, Ex. 25 (suggesting edits "to aid in readability" to FDA letter regarding LeadCare Ultra's 510(k)); Ex. 26 (suggesting "minor typographical" edits to the LeadCare Ultra MDR).

LeadCare Ultra.  *See* Dkt. No. 292 (Rule 11 Tr.) 17:5-18:7.  As the Company's President, she had an obligation to understand the Company's regulatory filing obligations and whether the Company was complying with those requirements.  Amy's narrow focus on customers was misguided and based on the mistaken belief that alerting customers of the issue and providing them with a working solution would be sufficient.  She knew LeadCare Ultra was regulated by FDA and that most substantive changes to the label of a medical device were subject to FDA review and approval, Dkt. No. 292 17:5-18:7, yet took actions that are wholly inconsistent with her sense of ethics and integrity.  In wanting to ensure the device was working for customers, her willingness to defer to those she considered experts, ultimately led her to be willfully blind to regulatory requirements the Company was obligated to comply with.  Amy was also aware that a failure to comply with such regulatory obligations could mislead the regulator, FDA.  *Id.*

She is deeply remorseful for failing to file a premarket notification in advance of sending the customer notification letter (Magellan only filed it years later, in March 2017, Ex. 27.  She similarly regrets not immediately filing the necessary report of device correction given the 24-hour incubation was designed to reduce the risk of suppressed lead results when testing blood samples on the LeadCare Ultra device (instead, Magellan only filed a Medical Device Report in April 2015, Ex. 28, alerting FDA to the customer-reported incubation issue, detailing the changed instructions, and providing a copy of the November 2014 customer letter).

Similarly, when the Company formally documented the 24-hour incubation as a label change internally and included a changed label with the sold LeadCare Ultra devices in August 2015, Ex. 29, Amy regrets failing to comply with those same regulatory requirements mandating notification of the change and correction to FDA.  She acknowledges her mistaken belief that both the customer-facing actions (the customer notification letter and formal label

change) as well as the April 2015 Medical Device Report were sufficient. She was again willfully blind to the Company's FDA regulatory obligations, tending to overly defer to her team of experts and focus on ensuring the device was working and in the hands of customers. *See* Dkt. No. 292 17:5-18:7. She deeply regrets her failure to act as required.

### 1.   What Amy Did Not Do

It is also important to understand what Amy did not do, in understanding her relative culpability compared to others who have committed similar regulatory violations. First, this is not a case where Amy was told by anyone either inside or outside the Company that the late premarket notification and a report of device correction were required to be filed, and she ignored or went against that advice.[3] Rather, no one raised this obligation, nor the timing of it, immediately following the circulation of the November 2014 customer letter requiring incubation. Amy was obligated to understand the Company's obligations and failed to do so, but the context here is critical. Second, this is not a case where Amy took pains to hide the incubation issue and the incubation requirement from the Government. Indeed, Magellan sent the customer letter with the incubation instruction to the Center for Disease Control and Prevention (the "CDC") the very day the letter was sent to customers in November 2014, Ex. 30, and Amy knew that the CDC worked hand in hand with FDA on lead prevention issues. Further, in April 2015 Amy caused Magellan to file a Medical Device Report with FDA which detailed the incubation issue and the changed instruction to customers, including attaching the customer letter itself. Ex. 28. Finally, it is also relevant that the evidence shows that FDA was not in fact misled by the failure to file a report of

---

[3] FDA guidance that Reba Daoust had consulted at the time stated in no uncertain terms that "[a] report [of device correction] is not required if the information has already been provided to FDA under Medical Device Reporting," which it was, through the April 2015 MDR. An internal 2017 FDA email demonstrates that FDA was uncertain regarding its own official guidance on this requirement. *See* Ex. 31.

device correction or timely file the premarket notification for the label change.  Indeed, documents belatedly produced by FDA revealed that Jeff Shuren, who was FDA's head of the medical devices unit in 2017, said the following when discussing the pending LeadCare recall and questions FDA should expect to receive, including the need to prepare a response to "the question why are we doing something now **when we knew about this since 2014**." (emphasis added).  Ex. 32.

***

Magellan eventually, and outside the prescribed regulatory timeline, in March 2017, filed a 510(k) application for FDA approval to change the label of LeadCare Ultra to allow customers to test the blood-reagent mixture after either a 24-hour incubation or, if the sample was heated to a certain temperature, one-hour incubation.  Two months later, FDA recalled the LeadCare devices with venous blood samples.[4]  Later that year, the U.S. Attorney's Office also began an investigation into Magellan, Amy, and others, which took place over the ensuing six-years, and which resulted in Amy's indictment in April 2023.

### F.    Amy's Guilty Plea

On March 10, 2025, Amy pled guilty to Count Six of the Indictment, a single count of misbranding under 21 U.S.C. § 331 and 333(a)(2).  Dkt. No. 282 (Plea Agmt).  The Government's April 4, 2023 Indictment charged Amy with multiple other counts: one count of conspiracy to commit wire fraud, two counts of wire fraud, one count of conspiracy to defraud an agency of the United States, and an additional count of introduction of misbranded medical devices into interstate commerce.  Dkt. No. 1.  Amy does not admit wrongdoing as to these counts, nor does

---

[4] *See Class 1 Device Recall LeadCare Blood Testing System*, U.S. Food & Drug Admin., June 5, 2017,    https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfres/res.cfm?id=155436    ("FDA recommends discontinuing the use of venous blood samples with any LeadCare Blood Lead Testing System (LeadCare, LeadCare II, LeadCare Ultra, LeadCare Plus).  **Capillary samples may still be used** on all LeadCare products" (emphasis added)).

she acknowledge any of the alleged conduct underlying those counts; she respectfully refers this Court to her objections to Probation's PSR, PSR at 50-81.[5]

Amy admits criminal wrongdoing as to Count Six as outlined above in Section II.E. She acknowledges with shame that she failed to notify FDA of the 24-hour incubation label change for LeadCare Ultra within the required regulatory timeframe and through the appropriate regulatory process. Specifically, Amy only caused the Company to file a premarket notification years later, in March 2017, and she failed to cause the Company to file a notice of device correction, instead only filing a Medical Device Report in April 2015. *See* Dkt. No. 292, 17:5-18:7.

For the avoidance of doubt, Amy does not accept responsibility for, let alone acknowledge, the total offense conduct that the Government alleges in its Statement of Offense Conduct ("Factual Statement"), Ex. 1, and that Probation reiterates in its PSR, ¶¶ 11-53 and 79. Amy's objections to the PSR, PSR at 50-81, outline in detail how the conduct that is alleged therein that Amy has not admitted or pled guilty to is: (i) not true, (ii) not proven and cannot be proven by the Government, which has not even attempted to support its claims with any tangible evidence, and (ii) not relevant to Amy's offense of conviction. C*f. United States v. Herlihy*, 336 F.R.D. 217, 226, 231 (D.N.M. 2020) (declining to consider allegations outside the narrow scope of defendant's plea as "relevant conduct" where the probation office "attribute[d] 'essentially all of the allegations in the original indictment to [the defendant] as relevant conduct'"). Amy also refers the Court to the disputed facts Probation has not taken a position on, noting them for the Court's review. *See* PSR.

---

[5] The Government's attempt to shoehorn all Indictment allegations into the conduct relevant for the Court's consideration at sentencing is entirely without merit. The Government has made no effort to substantiate its claims with reliable evidence. In contrast, Amy has consistently provided the Court with supporting and credible evidence, e.g., contemporaneous documents (including ones the Government had disclosed for trial), for her factual assertions about what occurred.

For example, the Government's Factual Statement included in the PSR is replete with alleged facts about Amy's purported conduct relating to the LeadCare II device which are (i) not true, (ii) not proven, and (iii) cannot be proven by a preponderance of the evidence. Ex. 1 *passim*; PSR ¶¶ 21-22, 32, 35, 42, 52-53. Further, Count Six relates only to LeadCare Ultra. Dkt. No. 292, 21:23. The Government's Factual Statement included in the PSR also includes alleged facts relating to pre-FDA approval tests on LeadCare Ultra and post-approval internal tests on the device before its December 2013 launch and in early 2014. Ex. 1 at 4-6; PSR ¶¶ 18-23. Beyond being irrelevant to Amy's offense of conviction, the Government cannot prove by a preponderance of the evidence that the unexpected results from these internal studies stemmed from the same incubation issue reported by customers in August 2014. To Amy, the issues were distinct. *See* PSR at 55-60 (Amy's Objections to PSR ¶¶ 18-23). As another example, the Government's Factual Statement and Probation's PSR allege facts relating to whether Magellan's November 2014 customer letter for LeadCare Ultra misled LeadCare Ultra customers. Ex. 1 at 7-8; PSR ¶¶ 29-31. Similarly here, the allegations are untrue, and the Government has not and cannot meet its burden to prove these allegations. *See* PSR at 62-64 (Amy's Objections to PSR ¶¶ 29-31). Further, all of these unsubstantiated and untrue facts are far outside the scope of conduct relevant to the regulatory failure to notify FDA about the LeadCare Ultra 24-hour incubation instruction within the required regulatory timeframe and through the appropriate regulatory process and should not be considered for sentencing purposes. *See, e.g.*, *United States v. Blanc*, 146 F.3d 847, 854 (11th Cir. 1998) ("To lump these discrete and unrelated frauds together for purposes of defining relevant conduct would require us to ignore the wholly distinct nature of these crimes simply because, at the highest order of abstraction, they both involved frauds. We are not prepared to paint with so broad and undiscriminating a brushstroke.").

21

Therefore, the Court should consider Amy's narrow regulatory violation and her state of mind and sentence Amy accordingly, taking into account the 18 U.S.C. § 3553(a) factors, *see* Section IV *infra*.

### G.    The Collateral Consequences Amy Has Suffered Since the Indictment

Amy is an experienced professional, as well as a dedicated mother and wife, who has consistently sought work and volunteering opportunities that foster her professional and personal development and fulfillment and that serve her community.

When Amy took on the role of President of Magellan, she was candid about her trepidation in taking a role that she had never done before, and in moving back into full-time work, but she took that leap. She stepped into the role as Magellan's President with a life sciences marketing background, the training she received as a business school student, the mentorship of a trusted advisor, Peter Glick, and a team of individuals she regarded as experts in areas beyond her expertise. The job ended up lasting years longer than she expected and had challenges far beyond anything she expected or prepared for. But Amy led the Company with compassion, positivity, and support. And despite her grave regulatory violation and other challenges she faced at Magellan, Amy thrived in her role and built a stellar reputation in the industry. Her leadership impressed industry leaders so much that after she voluntarily left Magellan following its sale to Meridian, she was hired as President of Bioporto Diagnostics in 2019 (by Peter Eriksen, a life sciences executive and advisor), and then as CEO of NanoImaging Services ("NIS") in 2021 (by Glick, who was a primary investor and Board Chairman in NIS).

Amy's flourishing career as a life sciences executive was abruptly ended when she was terminated from her CEO position at NIS immediately following the Indictment. She has been unable to work in her field since then and will never be able to return to that line of work. The public nature of the charges and the associated press coverage have irreparably damaged her

professional reputation, resulting in the loss of future career opportunities and financial security for her family. Despite having pled guilty to a single regulatory violation, the government continues to accuse her in the court of public opinion of charges it has willingly agreed to dismiss, unjustifiably continuing to damage her reputation.[6]

Amy's ability to volunteer has also been severely limited by the charges in the Indictment. She was forced to step down from multiple long-standing community service roles, including her positions on the Museum of Science's Board of Advisors and the Brigham and Women's Physicians' Organization board. Most devastatingly, she was immediately terminated from her role as a Big Sister to a young girl she had mentored for over three years and was not even permitted to say goodbye in person.

The emotional and psychological toll of the proceedings, including the very public and unproven accusations by the Government, on Amy has been severe. Amy has experienced ███████████████████████████████████████████████████████ ███████████████████████████████████ The impact has extended to her family with her husband describing the public accusations and press coverage as a source of extreme stress for their children, in particular their 22-year-old daughter Hadley, ██████████████████████ ████████████████████████████████. *See* Ex. 33 at 2-3 (Letter of Support from Mr. Winslow). Amy is now unable to travel internationally for the foreseeable future, in particular

---

[6] *See Three Former Executives for Magellan Diagnostics Plead Guilty to False Statements and FDCA Violations*, U.S. Att'y Office: Dist. of Mass., March 11, 2025, https://www.justice.gov/usao-ma/pr/three-former-executives-magellan-diagnostics-plead-guilty-false-statements-and-fdca (suggesting as true and proven certain allegations that Amy has not pled guilty to or even acknowledged, including that Amy concealed a device malfunction, that she misled customers, that she "endangered the health of children and other patients across the country," and that what she did was "dangerous" and to "benefit the corporate bottom line.")

to Canada, where her husband's family lives. *Id.* Amy has also faced practical consequences such as canceled credit cards and insurance policies, causing additional hardship on her household. *Id.*

The punishment that Amy has already endured is substantial, ongoing, and deeply felt, affecting every aspect of her personal, professional, and family life. Amy respectfully submits that a sentence of additional incarceration would be unnecessary considering the consequences she has already and will continue to suffer for years to come, and considering her character and the 18 U.S.C. § 3553 factors outlined in the following sections.

### H.    The Person Amy Truly Is

Amy's regulatory violation is an aberration from a life otherwise led with ethics, integrity, and an undeniable moral compass. The numerous letters submitted in support of Amy uniformly describe a woman of exceptional integrity, compassion, and steadfast moral judgment, whose life has been marked by service to others and personal accountability. *See* Exs. 33-45. Friends, colleagues, family, and professionals attest to her deep empathy, ethical principles, and emotional intelligence. Amy is consistently described as humble, diligent, and reliable, with a remarkable willingness to take responsibility, reflect, and grow. Amy's sense of civic duty is evident in her decades of community service: she co-chaired the Museum of Science's Women in Science and Engineering Committee, where she helped launch the "Women and Girls STEM Weekend" to inspire young women in science; she served on the Brigham and Women's Physicians' Organization board; and she mentored a young girl for over three years through Big Brothers Big Sisters, a role she found deeply meaningful and was devastated to lose due to her Indictment. She also taught Sunday School at her local church and, since the Indictment, has volunteered three days a week as an English-as-a-Second-Language instructor, dedicating over 10 hours weekly to helping immigrants in the Boston area integrate and thrive.

As a leader and peer coach, Amy is described as principled, thoughtful, and clear-eyed, elevating those around her with careful listening and sound judgment.  Members of her entrepreneurs' Forum group refer to her as the "moral compass" of the group, sought after for her empathy and insight.  In her personal life, Amy is unwaveringly supportive and generous as a wife, mother, and friend—often putting others' needs before her own and showing calm strength in times of crisis.  She has cared for family members during illness, organized weekly team dinners for her children and their friends, and provided comfort and practical support to friends facing loss or hardship.  Across decades and settings, the consensus is that Amy is a person of high character— guided by a strong moral compass, committed to the public good, and willing and capable of continued positive contributions to her family, community, and society.

## III.  ADVISORY GUIDELINES CALCULATION

The parties have not agreed on the appropriate Guidelines calculation for purposes of sentencing Amy.  The Government has calculated the total offense level under the Guidelines to be 29 but has agreed to recommend a sentence outside the Guidelines: incarceration of 12 months and one day, a fine of $10,000, 12 months of supervised release, and a mandatory special assessment of $100.  Dkt. No. 282, § 4 (Plea Agmt).  Probation has calculated the offense level at 21, and based on the statutorily authorized maximum term, provides a Sentencing Guidelines term of imprisonment of 36 months.  PSR, ¶ 140.  Pursuant to U.S.S.G. § 5G1.1, "[w]here the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."  Therefore, any proposed enhancements by the Government and Probation that raise the offense level above the statutory maximum of 36 months are not relevant.  The Court also retains discretion to impose a sentence outside of the Guidelines, but not higher than the statutory maximum.  *See United States v. Andujar-Colon*, 43 F.4th 226, 230 (1st Cir. 2022).

Amy submits that whether the Court decides to follow the Sentencing Guidelines, her total offense level is 2. Amy further submits that whatever the Court determines the offense level is, a sentence of time served, probation of 12 months, a fine of $10,000, and a mandatory special assessment of $100, is the only appropriate sentence. This sentence is also consistent with 18 U.S.C. § 3553(a) as outlined below in Section IV.

## A. The Government Has Not Put Forth Any Evidence in Support of Its Enhancements

Despite having agreed to a narrow guilty plea, the Government is now attempting to persuade the Court to establish facts that Amy neither admitted to nor committed, all without even attempting to submit sufficient evidence to meet its burden of proof. Indeed, to date, the Government has failed to provide any evidence to substantiate the conduct it claims is relevant to Amy's offense of conviction. The Government's Statement of Offense Conduct is remarkable for its complete lack of factual support. Ex. 1. The Government's Memorandum in support of its Guidelines Calculations, Dkt. No. 316, is also notable. It cites Probation's PSR as support, which essentially restates the attorney-drafted Government's Factual Statement and is similarly unsupported by any actual evidence. The Government's objections to the PSR are similarly devoid of any evidentiary support. PSR at 42-50 (citing again to the PSR for factual support).

In contrast, Amy, through counsel, has provided evidence to support all claims outlined in her submissions to the Court and to Probation. E.g., Ex. 46 (Compendium of Exhibits to Amy's Objections to PSR, PSR at 50-81). The Court itself noticed that "it seemed [the Government] is telling me just accept the PSR, and I don't think I'm willing to do that. […] I need to go deeper" and anticipated needing an evidentiary hearing to rule on the enhancements proposed by the Government. Dkt. No. 329 (June 26, 2025 Hr'g Tr) 6:1-13. The Government has expressly declined the opportunity to present evidence to the Court in support of its proposed enhancements.

Dkt. No. 328 at 2-3 (requesting the Court "decide the remaining guidelines issues on the papers, and based on the parties' arguments at sentencing, **without the need for an evidentiary hearing**" (emphasis added)).[7]

Amy agrees with the Court and invites it to "go deeper" into the evidence. As the Court will quickly perceive, the Government is like a conductor with a baton but no orchestra, claiming a symphony of evidence while no music plays. The Government does not have factual support to prove by a preponderance of the evidence that the alleged conduct underlying its sentencing enhancements in fact occurred. That reason alone should persuade the Court to reject the Government's enhancements.

### B.    Enhancements Under § 2B1.1 Do Not Apply

Although Amy pled guilty only with an intent to mislead, the Court ruled that the fraud guideline, that is U.S.S.G. § 2B1.1, applies to the present misbranding felony offense.[8] Dkt. No. 324. Even when applying the cross-reference to § 2B1.1, however, the Government and Probation have not and cannot meet their burden of proof with respect to their respective proposed enhancements.

---

[7] To the extent the Government attempts to argue that the Court should adopt its Factual Statement because the Company admitted to it as part of its resolution with the Government, that argument is wholly inappropriate. First, the Company agreed to that statement under duress, as it faced the threat of a felony indictment—a certain death knell for the Company. Second, no one at the Company in 2025 was present or involved at the time the relevant conduct occurred (2014 to 2017), which further undermines the credibility of the Factual Statement. Third, it is entirely unreasonable to consider an out-of-court statement by the Company as true for purposes of Amy's sentencing. Even if it were deemed appropriate, the aforementioned reasons demonstrate a complete lack of reliability, warranting its total disregard by the Court.

[8] Amy reserves all rights with regard to the Court's determination that the fraud Guideline applies.

1.    There Was No Loss Under § 2B1.1

The relevant facts to Amy's offense of conviction do not support finding any loss amount because there was no pecuniary (monetary) harm resulting from Amy's misbranding violation. U.S.S.G. § 2B1.1(b)(1).  The Government bears the burden of proving loss by a preponderance of the evidence, which it cannot do.  *See, e.g.*, *United States v. Alli*, 444 F.3d 34, 38 (1st Cir. 2006) (citations omitted).

Amy's offense of conviction involves failing only to notify FDA about the LeadCare Ultra 24-hour incubation instruction within the required regulatory timeframe and through the appropriate regulatory process.  Only FDA, the regulatory agency, was potentially harmed by Amy's conduct.  However, the Government has not alleged, nor has it presented any evidence, that FDA suffered pecuniary harm.  And the Government admitted as much in its objections to Amy's PSR, PSR at 44, and in connection with Amy's co-defendant, Reba Daoust, *see* Dkt. No. 313 ¶ 5 ("because the FDA did not suffer a pecuniary loss, the parties' calculation does not include an increase based on loss").  It would be unprincipled to apply a customer-based loss enhancement to one co-defendant and not the other when the victim in both cases is the same, FDA, and not any customers.

Magellan's customers are not victims of Amy's offense of conviction, and Amy agrees with Probation's finding that Magellan's "consumers sustained no loss." PSR ¶ 84.  Amy's offense of conviction began no earlier than November 2014.  Indictment ¶ 94; Dkt. No. 292 (Rule 11 Tr.) 18:12.  That is the exact time when Magellan first notified all 49 LeadCare Ultra customers about the 24-hour incubation instruction for LeadCare Ultra, first through the November 2014 Notice, Indictment ¶ 53, and subsequently with a notice included with all sold LeadCare Ultra devices and test kits that advised customers of the importance of incubating samples.  *See* Ex. 47 (Nov. 2014 email from Daoust updating Amy on the steps being taken to inform customers of the incubation

issue in Nov. 2014). They then again notified customers through the publicly available April 2015 Medical Device Report, and once more via the August 2015 label change for LeadCare Ultra. Indictment ¶¶ 59, 61. Particularly considering the fulsome and timely disclosure of information to LeadCare Ultra customers, there is no evidence that Magellan's failure to comply with regulatory timing and filing requirements for informing FDA of the label change in any way diminished the value of LeadCare Ultra devices or tests to customers.

The Government argues that "customers would not have purchased or used the devices had they known about the lead suppression issue." PSR at 44. That argument falls flat because customers were in fact aware of the potential for lead suppression and the incubation fix—all 49 LeadCare Ultra customers received, and acknowledged receipt of, the 2014 notification letter. Ex. 48 at 3. Even in more extreme cases where a medical device was sold *without* FDA approval or where approval was *obtained by fraud*, courts do not necessarily find that customers received no value. *See, e.g.*, *United States v. Prigmore*, 1996 WL 464030, at *6 (D. Mass. Aug. 7, 1996) (concluding that it is "unrealistic" that a consumer receives no value for a device sold "without FDA approval" because "[e]conomic loss should be calculated based on what the consumers expected to receive, contrasted with the benefit they actually received"). LeadCare Ultra customers, therefore, suffered no loss.

The Government also argues that customers did not receive the benefit of the bargain because the devices did not accurately test venous blood samples. That argument similarly fails. The November 2014 customer letter advised customers to implement a 24-hour incubation that had been tested and vetted internally to be an effective mitigation to ensure accurate results. *See* PSR at 62 (Amy's Objections to PSR ¶ 28, citing Ex. 27 therein (Sept. 2014 email from Norm Sheppard with data demonstrating efficacy of 24-hour incubation); *see also* Ex. 49 (Jan. 2015

email from Susan Garramone with same). More broadly, the LeadCare Ultra device always worked as it was supposed to—it was only when a customer used an adulterated BD tube that results could be suppressed. *See* PSR at ¶¶ 63-68.

a.    Commentary Note 3(E)(v) Does Not Apply

Contrary to Amy's PSR, the special rule in § 2B1.1, cmt. no. 3(E)(v) does not apply. PSR ¶ 84. That note states that in cases "involving a scheme in which. . . goods for which **regulatory approval** by a Government agency was required but **not obtained**, or was **obtained by fraud**, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services." U.S.S.G. § 2B1.1, cmt. no. 3(E)(v) (emphasis added). But as courts have concluded, the plain language of that rule makes clear that it only applies with respect to fraud in connection with the regulatory approval process—not the post-approval compliance process at issue here. *See, e.g.*, *United States v. Bane*, 720 F.3d 818, 825 n.6 (11th Cir. 2013) (noting only fraud directly affecting the regulatory approval process implicates Note 3(E)(v)). Further, Amy's relevant conduct is limited to acts and omissions done or caused by Amy in connection with the offense of conviction—failure to notify FDA about the LeadCare Ultra 24-hour incubation instruction within the required regulatory timeframe and through the appropriate regulatory process. Within the narrow scope of relevant conduct (and the record more broadly), the Government and Probation have not and cannot prove that Amy defrauded FDA to obtain approval of any LeadCare device (which approval was obtained more than a year before the date of the offense of conviction). On that basis, Note 3(E)(v) is not applicable to determine loss.

Probation takes the incorrect position that "the continued regulatory approval received for all devices was obtained by fraud because the incubation issue was not accurately portrayed to the FDA." PSR at 55. First, Probation takes as true the Government's allegation in its Factual

Statement that the incubation issue was not accurately portrayed to FDA. Although Amy was not responsible for communicating directly with FDA about the incubation issue at any point during the period of her offense of conviction, she understood that all communications to FDA had been accurate, truthful and reflecting Magellan's understanding of the issue at the time of the communication. Neither Probation or the Government can prove otherwise (nor have they presented any evidence to support their assertion). Second, there is no such thing as "continued regulatory approval" and Probation has not provided any support for this invented concept. At no point did FDA remove its approval for any LeadCare device; it simply issued limited recalls. *See* Section II.F. *supra*. Third, even accepting as true the concept of "continued regulatory approval," it is worth repeating that, at Amy's direction, FDA was aware of the incubation issue and corresponding label change as of, at the latest, April 2015. *See* Ex. 28; Ex. 32.

Even if Rule 3(E)(v) applies (it does not), the Government and Probation grossly overstate the scope of loss. *See* PSR ¶¶ 84, 93, at 44-46, and at 77-79, 80-81 (Amy's Objections to PSR ¶¶ 84, 93). For example, any purported loss related to LeadCare Plus and LeadCare II must be excluded given (1) Amy's offense of conviction only relates to the LeadCare Ultra, PSR at 45 (Amy's "offense of conviction... pertains only to the LeadCare Ultra device"), and (2) there are no allegations that FDA approval or "continued regulatory approval" for LeadCare Plus and LeadCare II were "not obtained" or "obtained through fraud." As it relates to LeadCare Ultra, the Government has not provided any basis for its "sales figure of $6,510,000," PSR at 45, and Amy submits that at most, any loss amount would be capped at the cost of the LeadCare Ultra devices purchased between the time of the customer letter in November 2014 and the time at which Magellan notified FDA of the customer complaints and the changed instruction in April 2015. More broadly, the Government's and Probation's calculations must also identify and exclude from

the calculation tests that were conducted using capillary samples or non-BD tubes, which were not affected by the incubation issue. *See, e.g.*, *United States v. Cadden*, 965 F.3d 1, 32 (1st Cir. 2020) (when applying Rule 3(E)(v), a court must exclude from loss calculations all sales for which there was no evidence that the product shipped was deficient).

2.    There Were No Victims Under § 2B1.1

Probation is correct that there are no identifiable victims and therefore the Government's loss enhancement for 10 or more victims does not apply to Amy. PSR ¶ 94; U.S.S.G. § 2B1.1(b)(2)(A)(i) (increasing offense level if the offense "involved 10 or more victims"). The Government's contrary contention finds no support in the law or facts.

A "victim" is "any person who sustained any part of the **actual loss** determined under subsection (b)(1); or... any individual who sustained **bodily injury** as a result of the offense." U.S.S.G. § 2B1.1, cmt. no. 1 (emphasis added). "Actual loss" is "reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1(b)(1)(C)(i). As discussed above, and as found by Probation, there is no "actual loss" under § 2B1.1(b)(1) (regardless of whether Note 3(E)(V) applies). PSR ¶¶ 84, 94. Since there is no loss, there are no victims. *See id.* Moreover, for the same reason that applying different loss enhancements to Reba Daoust and Amy is unprincipled and unsupported, *see supra*, there is simply no basis to apply a victim enhancement to Amy's Guidelines calculation and not Daoust's.

Although the Government contends that in addition to Magellan's customers, FDA and patients were also victims to Amy's offense, it does not argue that FDA or patients were in fact "victims" for purposes of this enhancement (because they were not, neither suffering any

pecuniary or physical harm).  *See* PSR at 47 (only noting, without support, that patients "*may have suffered pecuniary harm*" (emphasis added)).  For this reason, as well, there are no victims.[9]

### 3.    There Was No Risk of Death or Serious Bodily Injury Under § 2B1.1

Probation is correct that the Government has not met its burden to prove that Amy's "conduct constitutes a conscious risk or reckless risk of death or serious bodily injury."  PSR ¶ 95 and at 48; U.S.S.G. § 2B1.1(16)(A); *United States v. Chin*, 41 F.4th 16, 20 (1st Cir. 2022) (Government must prove U.S.S.G. § 2B1.1(16)(A) by a preponderance of the evidence). "[C]onscious" risk is risk "known to the defendant," and "reckless" risk is "the type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do."  *Chin*, 41 F.4th at 20 (citing *United States v. Lucien*, 347 F.3d 45, 56-57 (2d Cir. 2003)).

The Government has not identified any specific conduct by Amy demonstrating that she acted with a conscious or reckless risk of death or serious bodily injury.  Indeed, she did the exact opposite when she learned that two customers were experiencing low lead testing levels with their LeadCare Ultra machines in August 2014: she pushed the Company to investigate the issue and find a mitigation to fix the problem, insisting that all customers use the mitigation to eliminate any risk of a suppressed test result.  *See* Ex. 50 (Nov. 2014 email from Amy to Magellan's Board discussing the customer-reported incubation issue and the steps being taken to address it).  There is therefore no basis in the record to conclude that Amy, by failing to ensure that the Company

---

[9] To the extent the Government attempts to argue at sentencing that patients are victims under § 2B1.1, that argument fails.  The Government has no evidence that any patient actually suffered physical harm from an allegedly falsely low LeadCare Ultra test, nevertheless as a result of the failure to make a timely or appropriate regulatory filing.  *See* Dkt. Nos. 215, 252-1; Dkt. No. 300 (March 5, 2025 Final Pretrial Conference Tr.) 41:9-48:8 (Court expressing "doubts" about the Government's theory of patient harm and whether to even allow at trial any evidence regarding alleged patient harm).

notified FDA about this change within the required regulatory timeframe and through the appropriate regulatory process, in any way created a conscious or reckless risk of death or serious bodily injury necessary for an enhancement under § 2B1.1(16)(A).[10]

Furthermore, the incubation issue "did not result in sufficiently large discrepancies between the affected test results and actual blood lead levels such that the discrepancies would have impacted whether a patient required interventions such as chelation therapy or hospitalization."  Ex. 51 at ¶ 12.b (Expert Report of Dr. Banner); *see also* PSR at 51-52 (Amy's Objections to PSR ¶¶ 14-15).  Therefore, it would be impossible to demonstrate that the failure to file regulatory forms on time could result in the risk of death or serious bodily injury, and the Government cannot prove otherwise.

### C.    The § 3B1.1(a) Adjustment For Role in the Offense Does Not Apply

Probation is also correct that there is no basis for an adjustment under § 3B1.1(a) for Amy's role in the offense.  PSR ¶ 97 and at 49.  The "organizer or leader" enhancement applies only if the defendant organized or led "a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  The inquiry under § 3B1.1(a) is "innately fact-specific" and requires examination of what exactly the defendant did, not merely her title.  *United States v. Kabouni*, 641 F. App'x 6, 7 (1st Cir. 2016).  Before applying the enhancement, courts consider several factors including "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the

---

[10] The Government's emphasis on the failure to timely file Medical Device Reports in its objections to Amy's PSR is inapposite.  Amy did not plead guilty to failing to timely file Medical Device Reports, and the failure to timely file these reports, which Amy has not admitted to, cannot therefore be "at the core of [Amy's] charged conduct."  PSR at 47-48.  The Government's claiming otherwise underscores the inapplicability of this enhancement.

offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. no. 4.

The Government boldly argues for this enhancement without presenting any substantive evidence, and that alone should dissuade the Court from considering it. First, the Government has failed to identify, let alone name, five or more participants involved in or recruited as accomplices for her offense. Second, the Government's claims that Amy was intimately involved and had decision-making authority over studies, customer communications, regulatory filings, and FDA communications, PSR at 48-49, are both unsupported and contradicted by the evidence:

- Amy never directed anyone on "how to handle internal tests and studies" related to the incubation issue. She was not a scientist and lacked the necessary technical expertise. Her involvement was limited to listening and asking questions, allowing her team to make the final decisions on studies and data analysis. E.g., Ex. 52 (Oct. 2013 email from Amy to Glick that "the data from last week's experiments looked better... but not good enough that **Hossein felt comfortable** releasing the kits" (emphasis added)). *See also generally* Ex. 53 (Amy's handwritten notes from a Sept. 2014 R&D meeting reflecting her team's discussion of various experiments considered and product updates); *see* PSR at 56-57, 64-65, 66-67 (Amy's Objections to PSR ¶¶ 19, 32, 35).

- She did not direct her team on "how to respond to customer complaints about the lead suppression issue." Magellan's Product Support Team asked Daoust, and not Amy, to review draft responses to customer communications, *e.g.*, Ex. 54 (Sept. 2014 calendar invite from Daoust (not including Amy) to "discuss incubation time and company party line"); Ex. 55 (Oct. 2014 email from Daoust with edits to a draft email to a customer (Amy is not on)); Ex. 49 at 2 (Jan. 2015 email thread discussing 24-hour incubation notice. Daoust is asked to sign off on its contents (Amy is not on)). When her input was needed, Amy provided it by brainstorming with her team rather than making decisions for them. *E.g.*, Ex. 17 (Aug. 2014 email from Amy asking her team to let her know "when/**if** you want me to jump in" (emphasis added)); Ex. 18 (Oct. 2014 email from Amy offering Robb Morse to "strategize" following Morse's request for her advice); Ex. 56 (Nov. 2014 email thread discussing customer inquiries, not including Amy in the last two communications).

- She did not direct her team on "whether and how to make required regulatory filings with the FDA." Amy did not instruct anyone not to notify FDA about the 24-hour incubation instruction. Although she did not notify FDA of the label change for LeadCare Ultra within the required regulatory timeframe and through the appropriate regulatory process, she approved the filing of a Medical Device Report that fully notified FDA (and the public) of the incubation issue in April 2015.

Indictment ¶ 60; *see* Ex. 57 (April 1, 2015 email from Amy to Magellan Board informing them of the need to file an MDR). Moreover, Amy was not herself a regulatory expert and relied on regulatory consultants regarding the 510(k) process and other regulatory filings, without dictating whether such filings should or should not be made at any particular time. *E.g.*, Ex. 9 (April 2015 email from regulatory consultant Marcia Zucker advising not to "call [FDA's] attention" to the "revised insert" for LeadCare Plus); *see also* PSR at 61-62 (Amy's Objections to PSR ¶ 27).

- She did not direct her team on "how to respond to FDA inquiries regarding when Magellan first discovered the problem." As stated above, she relied on the regulatory experts for guidance and direction on responding to FDA inquiries. *See* PSR at 70-71 (Amy's Objections to PSR ¶¶ 44-46, citing Ex. 54 therein (May 2017 email discussing response to FDA inquiry)).

The mere fact that her title was CEO of Magellan does not mean that she took on any leadership or organizing role in the specific crime to which she pled guilty. *See United States v. Ofray-Campos,* 534 F.3d 1, 41 (1st Cir. 2008). *See also* PSR at 49. Understanding Amy's leadership style is essential to comprehending how she led the Company. Amy was not a micromanager and did not (and could not) oversee every business decision. Her leadership involved assembling a competent team to make informed decisions, rather than centralizing all decision-making authority.

Amy disagrees with the Government's contention that her conduct is more culpable than that of Reba Daoust's. Ex. PSR at 48-49. Although Amy held a higher position than Daoust, consistent with her leadership style, she entrusted Daoust with the autonomy to fulfill her role and responsibilities. Daoust's responsibilities included regulatory affairs, and Amy hired regulatory consultants to support Daoust in that capacity. *See e.g.,* Ex. 9; *see also* PSR ¶ 39; PSR at 68-69 (Amy's Objections to PSR ¶ 39).

The Government also argues that Amy "stood to gain" a "substantial bonus" from the acquisition of Magellan. PSR at 48. First, the sale of the Company is entirely unrelated to her offense of conviction. Second, Amy received a standard bonus typical for someone in her position during a company sale. Third, Meridian acquired Magellan with full knowledge of the LeadCare

Ultra incubation issue and the Company's efforts to resolve the issue. *See* PSR at 66, 69 (Amy's Objections to PSR ¶¶ 17, 34, 40-41).

For these reasons, the Court should not apply any role-in-the-offense enhancement.

### D.    Amy is Entitled to a Two-Point Decrease Under U.S.S.G. § 4C1.1

Because the role enhancement under § 3B1.1 does not apply, Amy agrees with Probation that she meets the criteria provided at § 4C1.1(a)(1)-(11) and therefore qualifies as a Zero-Point Offender. U.S.S.G. § 4C1.1(a)(1)-(11) (allowing for a two-level reduction when a defendant meets the listed criteria, including they did not receive an adjustment under § 3B1.1). Amy is entitled to a two-level reduction on that basis.

### E.    Amy's Total Offense Level is 2

Therefore, for the reasons set forth above, Amy's total offense level is 2 (base offense level of 6, decreased by 2 for acceptance of responsibility, and decreased by 2 for being a Zero-Point Offender). The applicable range is 0-6 months' imprisonment, and because the guideline range is in Zone A, "a sentence of imprisonment is not required." U.S.S.G. § 5C1.1(b). Amy, therefore, respectfully requests no imprisonment, since it is both not required and not necessary for the reasons set forth in this memorandum.

## IV.    APPLICATION OF THE 18 U.S.C. § 3553(A) FACTORS

Federal sentencing dictates that every convicted person be considered as an individual and "every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *United States v. Flores-Gonzalez*, 86 F.4th 399, 413 (1st Cir. 2023), cert. denied, 145 S. Ct. 181 (2024) (quoting *Gall v. United States*, 552 U.S. 38, 52 (2007)).

In addition to consulting the Guidelines, the Court must conduct an "individualized assessment" of the circumstances at issue "based on the facts presented." *Gall*, 552 U.S. at 50. That analysis must be guided by "[r]easonableness" and an "individualized application of the

statutory sentencing factors."  *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 46-47).  As set forth in 18 U.S.C. § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary."

Amy submits that a sentence of time served, 12 months of probation, and a $10,000 fine (the statutory maximum) is sufficient to satisfy the sentencing purposes defined in § 3553(a).

### A.    Nature of the Offense and Characteristics of Amy

#### 1.    <u>The Nature of the Offense</u>

Amy's offense is a single regulatory violation that amounts to failing to notify FDA of the LeadCare Ultra label change adding a 24-hour incubation instruction within the required regulatory timeframe and through the appropriate regulatory process.  To be clear, Magellan did notify FDA of the customer-reported issue with LeadCare Ultra and the fact that the Company changed the instructions to require a 24-hour incubation through a Medical Device Report in April 2015.[11]  *See* Section II.F. *supra*.  Amy's regulatory violation involved no risk of death or serious bodily injury and resulted in no pecuniary loss.  *See* Section III. *supra*.

#### 2.    <u>The Nature of the Offender</u>

Amy's offense is a stark deviation from her otherwise exemplary life as a law-abiding citizen, known for her upstanding ethics, integrity, and moral compass.  The letters submitted on her behalf paint a picture of an accomplished woman whose life has been defined by hard work, compassion, and an unwavering commitment to her family and community.  Exs. 33-45.  Her friends, colleagues, and family members consistently describe her as a person of extraordinary character, whose actions have positively impacted those around her.  *Id.*

---

[11] FDA also acknowledged in an internal May 2017 email that the agency knew about the issue since 2014.  Ex. 32 (stressing the need to prepare a response to "the question why are we doing something now **when we knew about this since 2014**." (emphasis added)).

First and foremost, Amy is a devoted mother. In her letter of support, her daughter, Hadley, recounts how her mother put her own life on hold to support her through a challenging period during her first year of college, demonstrating an "uncanny ability to prioritize others" while excelling in her professional life (Amy was at the time CEO of Nanoimaging Services). Ex. 43. Amy also created a "Supper Club," organizing weekly dinners for her then-high school son and his friends, providing them with a space of "warmth and community." Ex. 41. Her generosity and altruism are recurring themes in the testimonials provided by those who know her best.

While prioritizing her family, Amy also pursued her professional goals, eventually leading to CEO roles at two life sciences companies following her tenure at Magellan. Unfortunately, the Indictment led to her termination from her last executive position and the abrupt end of her hard-earned career. Professionally, Amy's journey has been marked by purposeful ambition, resilience and accountability. When she assumed the role at Magellan Diagnostics, she did so without the typical multi-decade-long experience expected of a CEO in an FDA-regulated company. Nevertheless, she approached her responsibilities with care, diligence and a willingness to learn, qualities that her peers praise in their letters of support. Magellan's Executive Chairman of the Board, Peter Glick, was so impressed by Amy's leadership, particularly in navigating the challenges she encountered for the first time at Magellan, that he rehired her in 2021 to lead another of his companies, Nanoimaging Services.

Her friends and colleagues describe Amy as the kind of friend you always want in your corner. In her letter of support, Alexandra D. Lahav, a law professor and long-time friend, shares personal stories of Amy's unwavering support during difficult times, such as helping Lahav through her father's terminal illness and her mother's Alzheimer's diagnosis. Ex. 40. In her letter, Lori P. Knowles recounts how Amy comforted her through the sudden loss of her husband,

consistently including Knowles and her son in family gatherings. Ex. 44. These acts of kindness and empathy are emblematic of Amy's character and her deep commitment to those she cares about.

Amy's dedication to community service further underscores her character. For several years, she volunteered as a Big Sister to a young elementary school girl, building a close relationship and taking her on engaging adventures around Boston. The Indictment abruptly ended this relationship and left Amy heartbroken. She was even more devastated by her inability to say goodbye to that young girl in person. *See* Exs. 33, 40-41. Before the indictment, Amy also co-chaired the Museum of Science's Women in Science and Engineering Committee, where she played a pivotal role in creating the "Women and Girls STEM Weekend," engaging families and mentoring girls in science and engineering. Following and despite the Indictment, Amy continued to find meaningful ways to contribute, such as volunteering to teach English as a second language to new American citizens. Her efforts to inspire young women and her support helping immigrants to integrate and thrive are testaments to her profound sense of civic duty and her desire to make a positive impact.

Her husband, Toffer Winslow, describes Amy as a "pillar of her community, an accomplished professional, a true friend to many, and the cornerstone of our immediate and extended family." Ex. 33. In his letter of support, he highlights the profound impact the Indictment has had on Amy's and their family's life. Beyond the narrow regulatory violation for which she pleaded guilty, the unproven allegations in the Indictment, and the way the Government has portrayed them to the public, have ended a promising career, led Amy to question her personal identity, and ███████████████████. Despite these overwhelming challenges, she has remained a steadfast partner and mother, and deeply involved with her community.

This single regulatory violation, committed over a decade ago, does not reflect the true Amy. Her singular lapse in judgment, a moment she deeply regrets, does not define her. She has already suffered the consequences of her grave violation. Family, friends, and colleagues agree that the Amy Winslow they know is a woman of remarkable character, professional integrity, and genuine dedication to her family and community. Her supporters urge the Court for leniency, as further punishment (imprisonment) would serve no purpose and would be disproportionate considering the nature of the offense and the offender. Amy should be given the opportunity to remain in the community under probation, allowing her to continue performing her civic duty as well as ██████████████████████████████████████.

***

For these reasons, and those detailed in the preceding sections, this factor supports a non-Guidelines sentence and justifies a sentence of time served and probation rather than further incarceration. *See also* U.S.S.G. § 5K2.20 (permitting the Court to consider a downward departure for the aberrant nature of a defendant's conduct that gives rise to the offense).

### B.    Amy's Proposed Sentence Provides a Just and Adequate Punishment for the Offense

The Court must consider the need for the sentence imposed to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "afford adequate deterrence;" "protect the public from further crimes of the defendant;" and "provide the defendant with [the needed training, care or treatment] in the most effective manner." § 3553(a)(2).

First, the offense levels calculated by the Government and Probation are both unsupported by law and fact and well above the statutory maximum. The Government's proposed non-Guidelines sentence, imprisonment of 12 months and one day, likewise "substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1 cmt. no. 21(C). Amy's crime was a regulatory

violation that involved no risk of death or serious bodily injury, and that did not result in any loss. No one was harmed, physically or through pecuniary loss, as a result of her wrongdoing. Although FDA was not notified on time and through the appropriate process, the agency was notified of the incubation issue and the label change through both the April 2015 Medical Device Report and the premarket notification filing in March 2017.

The conduct underlying Amy's offense occurred over eight years ago, and since the Indictment, Amy has complied with all Court-ordered conditions of release. PSR at ¶ 7. Amy's proposed sentence—time served, 12 months of probation, a fine of $10,000 (the statutory maximum), and a mandatory special assessment of $100—is both adequate and appropriate to uphold respect for the law and deliver just punishment. Moreover, as stated in Section II.G. above, Amy will continue to suffer the collateral consequences of this conviction for years to come, including the loss of her hard-earned career as a life sciences executive and the loss of community service opportunities that were deeply meaningful to her. These consequences have already had a punishing, reforming, and deterring effect on Amy, and will serve as a constant reminder of her singular failure to honor her values.

Second, the proposed sentence also provides adequate deterrence to criminal conduct. Amy has learned her lesson. As a person known in the community for her sense of ethics and integrity, Amy has been deeply shamed by the Indictment and the plea she entered. It is clear from the evidence submitted that the mere fact of having admitted the crime of failing to notify FDA about the LeadCare Ultra 24-hour incubation instruction within the required regulatory timeframe and through the appropriate regulatory process is ample deterrent for Amy and individuals similarly situated to ensure compliance with FDA regulatory requirements.

Third, the Sentencing Guidelines recognize that a first offender is less culpable than a defendant with a record of prior criminal behavior.  U.S. Sentencing Guidelines Manual ch. 4, pt. A, intro. cmt.  Congress has also recognized "the general appropriateness of imposing a sentence other than imprisonment" for first offenders not convicted of a "crime of violence or an otherwise serious offense," such as is the case here. 28 U.S.C. §994 (j).  It should be evident to anyone who knows Amy personally, or who reviews the evidence underlying this memorandum, that this is the first and only time she will be before this Court as a criminal defendant—there will be no further crimes for which the Court needs to protect the public from Amy.

Finally, the Government's handling of this case has been unjustifiable and has severely impacted Amy's emotional well-being.  From the Indictment through the guilty plea, the Government has irresponsibly sensationalized the case in the court of public opinion, portraying Amy as a criminal mastermind who "knowingly endangered the health of children and other patients across the country," which is completely untrue and for which there is no evidentiary support.[12]  The Government accepted Amy's guilty plea to a narrow regulatory violation, agreeing to dismiss the multiple fraud and conspiracy counts initially alleged.  Yet, even after her narrow plea, the Government has persisted in misleading the public, putting out a press release suggesting Amy committed crimes that she absolutely did not do.  Amy did not deceive customers, nor did she "knowingly endanger" patient health, to "benefit the corporate bottom line."[13]  The Government's unscrupulous actions have unjustly harmed Amy since its investigation began, and this government misconduct must be considered when determining her punishment for the single regulatory violation she pled guilty to.  As a direct consequence of this case, Amy has sought

---

[12] *Three Former Executives for Magellan Diagnostics Plead Guilty to False Statements and FDCA Violations, supra.*

[13] *Id.*

████████████████████████████████████, for the first time.  *See* Section II.G. above.
Incarceration would undoubtedly ████████████████████████.

For these reasons, these factors also support a non-Guidelines sentence and justify a sentence of time served and probation rather than further incarceration.

### C.    A Sentence Other than Incarceration is Appropriate

The Court must consider the kinds of sentences available, including the applicable sentence under the Sentencing Guidelines. § 3553(a)(3)-(4).

Because the applicable guideline range (offense level of 2) falls within Zone A of the Sentencing Table, the Court is not required to consider a sentence of imprisonment.  U.S.S.G. § 5C1.1(b).  *See* Section III. above.  The Guidelines clearly indicate that the Sentencing Commission intended for Zero-Point offenders like Amy to receive non-imprisonment sentences. *See* U.S.S.G. § 5C1.1, cmt. no. 10.  As outlined in detail in the preceding sections, Amy's crime stands in stark contrast with a life otherwise led as a law-abiding citizen.  Amy's regulatory violation was her first and only offense, it involved no risk of death or serious bodily injury, and it resulted in no harm or loss.  Amy meets all the criteria in U.S.S.G. § 4C1.1 to receive a downward adjustment.  And Probation agrees, *see* PSR at ¶ 102.

Even if the Court agrees with the Government's or Probation's offense level calculations (as lowered to the maximum statutory sentence under U.S.S.G. § 5G1.1) (for the reasons stated in Section III. above, it should not), the Government has agreed to a departure from the applicable guideline range and recommended a sentence of imprisonment of 12 months and one day.  That proposed sentence would place Amy in Zone B of the Sentencing Table and would again warrant the same conclusion that a non-imprisonment sentence is the only appropriate sentence for a Zero-Point offender like Amy.  *See* U.S.S.G. § 5C1.1, cmt. no. 10; *see* U.S.S.G. § 5C1.1(c)(3) ("the minimum term may be satisfied by... a sentence of probation....").

Beyond the advisory Guidelines range, the Court has the discretion to consider any relevant factors to establish an "individualized" sentence. 18 U.S.C. § 3553(a); *see Flores-Gonzalez*, 86 F.4th at 413.  As explained above, Amy has already faced significant punishment in the court of public opinion, far exceeding the scope of her guilty plea.  The Government's public comments have continued to accuse her of conduct she absolutely did not commit and that the government could never prove, when in fact, her crime, while a serious violation of regulatory requirements, did not cause any tangible harm or loss.  Given the nature of her conduct and character, nothing more than a sentence of time served, in addition to probation and a fine, is warranted.  Amy should be permitted to continue facing the consequences of her omissions at home, where she can continue ████████████████████████████████, supporting her family—her daughter Hadley is currently living at home while applying to medical school, and her son Nate is enrolled nearby at Northeastern University, and serving her community through her civic engagement (which has also been severely limited since her indictment).  Furthermore, since the Indictment, Amy has complied with all Court-ordered conditions of release.

For these reasons, Amy submits that a sentence of time served, 12 months of probation, a fine of $10,000, and a mandatory special assessment of $100 is sufficiently punitive and consistent with the policy and purpose of the Sentencing Guidelines.

### D.    The Government's Proposed Sentences Create a Sentencing Disparity With Other Culpable Parties

On May 21, 2024, Magellan agreed to plead guilty to two misdemeanor offenses of introduction of misbranded medical devices into interstate commerce.  CR No. 24-10146-PBS. Magellan's corporate plea included broad factual admissions that went well beyond the factual predicate for Amy's offense of conviction.  *Contrast* Dkt. No. 319-6 (Magellan Diagnostics Criminal Information at Count Two (¶¶ 45-46)) *with* Dkt. No. 292, 15:9-19, 17:5-18:1, 18:11-19:5

(Rule 11 Tr.).  The Court did not apply the cross-reference to § 2B1.1 at the Company's sentencing (nor did Probation or the Government advocate that the cross-reference should have applied to properly calculate the Company's Guidelines range).  *See* Dkt. No. 319-7 (Magellan Diagnostics' PSR).  The Court did not apply any enhancements to the Company's sentence either (nor did Probation or the Government advocate for any).  *See id.* ¶¶ 3-7.  At the June 26, 2025 hearing discussing which Guidelines applied to the offenses of conviction for Amy and her co-defendants, the Court stated that it was "only fair" for the Court to consider the corporation's plea in deciding Amy's sentence.  Dkt. No. 329, 23:2-6; *see also id.* at 21:18-21 ("I do think there's an element of unfairness to this that the corporation is allowed to plead out to something completely different").

The Court held that the cross-reference to the fraud Guidelines applies based on Amy's counts of conviction in the Indictment.  Dkt. No. 324.  The Company's counts of conviction similarly charged the Company with an intent to defraud and mislead, yet the cross-reference to the fraud Guidelines was not applied.  The mere fact that the Government allowed Magellan to plead guilty in a misdemeanor context and without the felony "intent to defraud or mislead" element cannot justify a harsher sentence for Amy.  *See* Ex. PSR at 50-81 (disputing the relevance of certain alleged conduct).

Magellan's total offense level was 6.  That Amy's total offense level has been calculated to be 29 by the Government and 21 by Probation is fundamentally unfair when compared to the Company.  To hold Amy more culpable than the Company she led merely because of her title ignores the reality that Amy did not make decisions or take actions in a silo—she consistently consulted with her team of experts both within and outside the Company.  Imposing harsher punishment on the individual in this context sets a dangerous precedent, potentially discouraging talented individuals from assuming leadership roles due to fears of disproportionate personal

liability.  It may also undermine the deterrent effect on companies, which might perceive that they can shield themselves behind one individual's culpability.  A just sentence should be commensurate with the actual level of wrongdoing.  Magellan's plea acknowledged broader misconduct; it would thus be inconsistent and unjust to impose a harsher sentence on Amy for a lesser scope of conduct, regardless of the *mens rea*.  *See United States v. Bishoff*, 58 F.4th 18, 25-26 (1st Cir. 2023) (sentencing disparity should be avoided at both the national level and between similarly situated coconspirators and codefendants).

As a reminder to the Court, FDA found that the incubation issue with LeadCare Ultra was caused by adulterated BD tubes, resulting from BD changing the chemical makeup of its rubber stoppers and failing to comply with its regulatory obligations to notify and seek approval from FDA before doing so, in violation of the same laws at issue here.  *See* PSR at ¶¶ 63-68; *see also* Ex. 58 (Jan. 2018 email contrasting FDA's investigation and response towards Magellan and BD regarding the incubation issue).  Magellan had no oversight over these tubes, as customers purchased them separately and not as part of the LeadCare kits.  Moreover, the evidence demonstrated that when Magellan first suspected that BD's tubes might be the source of the incubation issue, BD lied to Magellan about the fact that it made changes to its rubber stoppers. Ex. 59 (April 2017 internal FDA email noting "BD indicated to [Magellan] that the tube had not changed . . .  BD has told us something different").  Yet, neither BD nor any BD executive was charged in connection with the misbranding of certain BD tubes.  Amy urges the Court to take into consideration that BD and its executives managed to walk away scot-free when determining the fairness of her sentence.

Therefore, this factor similarly supports a non-Guidelines sentence and justify a sentence of time served and probation rather than further incarceration.

### E.    No Restitution Is Due

Amy is fully prepared to pay the maximum $10,000 statutory fine as part of her sentence. No party has requested restitution in this case, further underscoring that no direct financial harm resulted from Amy's offense. *See* PSR, ¶¶ 150-151. The absence of any restitution request highlights the lack of identifiable victims and further supports the appropriateness of a non-custodial sentence of probation.

## V.    CONCLUSION

Magellan was Amy's first company as CEO. She brought with her extensive experience in sales and marketing within the life sciences industry, but lacked experience in regulatory compliance, quality assurance, R&D, and operations. Amy approached the role with both trepidation and excitement, eager to advance her career with the guidance of a trusted mentor and advisor. Despite facing numerous challenges, she endeavored to overcome them to the best of her ability. However, she failed to ensure that her company complied with all FDA regulatory obligations, specifically neglecting to notify FDA about the LeadCare Ultra 24-hour incubation instruction within the required regulatory timeframe and through the appropriate regulatory process. This is the regulatory violation she committed and sincerely regrets. She did not commit any other crime. While acknowledging the seriousness of her violation, her omissions, importantly, did not result in bodily injury or death, and did not cause any financial loss. Although FDA was not notified in a timely manner or through the correct regulatory channel, it was eventually informed of the issue and label change a few months later.

This offense is an anomaly in Amy's life, which she has otherwise lived as an upstanding citizen, caring deeply for her community in addition to her own family and friends. The questioning of her ethics and integrity throughout this proceeding has taken a significant toll on her. The irreparable harm she has suffered, and continues to endure, has already served as a

substantial sentence for the foreseeable future, not only for the offense she committed but also for the unproven accusations in the Indictment.  A term of further imprisonment for Amy would thus serve no purpose, other than to overly and unnecessarily punish her.

For the reasons detailed in this memorandum, Amy respectfully submits to the Court that a sentence of time served, 12 months of probation, a fine of $10,000, and a mandatory special assessment of $100 is the only just sentence.  This sentence is also "sufficient, but not greater than necessary," in accordance with U.S.C. § 3553(a).

Dated:   October 22, 2025

Respectfully submitted,

AMY WINSLOW,

By her attorneys,

/s/ William J. Trach
William J. Trach (BBO# 661401)
Nathan A. Sandals (BBO# 696032)
Patricia Amselem (BBO# 705088)
Latham & Watkins LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 948-6000
william.trach@lw.com
nathan.sandals@lw.com
patricia.amselembensadon@lw.com

Terra Reynolds (*pro hac vice*)
Latham & Watkins LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
terra.reynolds@lw.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those identified as non-registered participants on October 22, 2025.

*/s/ William J. Trach*
William J. Trach