# EXHIBIT 1

# Memorandum

*United States Attorney*
*District of Massachusetts*



| | |
|---|---|
| Subject:<br>United States v. Amy Winslow, Hossein Maleknia, and Reba Daoust, 23-cr-10194-PBS – Government's Statement of Offense Conduct | Date:<br>April 1, 2025 |
| To:<br>Luciana Sousa<br>Senior U.S. Probation Officer | From:<br>Kelly Begg Lawrence<br>James D. Herbert<br>Leslie A. Wright<br>Assistant U.S. Attorneys |

### *The company and its devices*

Magellan Diagnostics, Inc., headquartered in Billerica, Massachusetts, is the nation's leading manufacturer of medical devices for testing lead levels in the blood of children and adults. During the relevant time, Magellan's stable of blood lead level testing devices included LeadCare II, LeadCare Ultra, and LeadCare Plus.





**LeadCare II** (2006)
Point-of-care device that analyzed fingerstick and venous samples.

**LeadCare Ultra** (2013)
High-volume lab instrument that analyzed venous and fingerstick samples.

**LeadCare Plus** (2015)
Small-volume lab instrument that analyzed venous and fingerstick samples.

Each of the LeadCare devices works by collecting a blood sample—either from a vein, known as a venous test, or through a finger-stick, known as a capillary test—and mixing the sample

with a chemical, called a treatment reagent, that separates lead from red blood cells so that it can be detected. That mixture is placed onto a sensor that goes into the Magellan device for a blood lead level reading. Magellan's business model was a "razor/razor blade model," in which it made money by selling the LeadCare devices but made significantly more money by selling customers the test kits needed to operate the devices.

According to the Centers for Disease Control and Prevention (CDC), there is no safe level of lead in the blood. Further, as reflected on Magellan's LeadCare devices' package inserts, "childhood lead poisoning is a major, preventable problem in the United States. Numerous studies have shown that exposure to lead can result in damage to the nervous, hematopoietic, endocrine, renal, and reproductive systems causing irreversible lifelong physical and mental health problems. Children are particularly susceptible to the effects of lead as their nervous systems are still developing." Lead exposure may damage children's ability to learn, ability to pay attention, and academic achievement. High levels of lead exposure attack the brain and central nervous system and may cause coma, convulsions, and even death. Accurate testing and monitoring of blood lead levels is an important part of lead poisoning prevention efforts.

In 2012, the CDC introduced a medical threshold at blood lead levels of 5 micrograms per deciliter to identify children and adults who have elevated blood lead levels. At that level, the CDC recommended that healthcare providers obtain from their patients an environmental exposure history to identify potential sources of lead and arrange for an environmental investigation of the patient's home to check the environment for possible causes of lead exposure and recommend ways to prevent further lead exposure. The CDC also recommended follow-up lead testing at recommended intervals for children with levels of 5 micrograms per deciliter or higher. If the blood lead test result was below 5, doctors typically would not intervene in this way. The CDC

recommended additional interventions by doctors, including hospitalization, at higher blood lead level thresholds.

### The defendants

Defendant Amy Winslow was Magellan's President from 2011 to 2018 and Chief Executive Officer from 2013 to 2018. In 2012, defendant Hossein Maleknia joined Magellan as Chief Operating Officer and Vice President of Operations and soon hired defendant Reba Daoust as Manager and Director of Quality Assurance and Regulatory Affairs. By the time the defendants joined Magellan, LeadCare II was a well-established legacy product for point-of-care (mostly pediatricians' offices) blood lead testing, and it had obtained significant market share of blood lead tests conducted in the United States. None of the defendants was involved in the FDA submission and approval process when LeadCare II was cleared in 2006, but all of the defendants were involved in Magellan's testing, application for FDA clearance, and sales launch of the LeadCare Ultra device in 2012-2013 and LeadCare Plus in 2014-2015.

### LeadCare Ultra application for FDA clearance (November 2012)

In November 2012, Magellan sought clearance from the FDA to market the LeadCare Ultra, which was intended for laboratory use in testing blood lead levels. Instead of seeking pre-market approval as a new device, Magellan submitted a traditional 510(k) application[1] for LeadCare Ultra, claiming that it was substantially equivalent to the already-cleared LeadCare II device, which was used primarily in doctors' offices. Daoust had primary responsibility over regulatory affairs and was one of a handful of individuals at the company in charge of clinical testing and FDA submissions. Winslow and Maleknia were aware of and involved in Magellan's

---

[1] Such applications are authorized by Section 510(k) of the Food, Drug, and Cosmetic Act, 21 U.S.C. Chapter 9.

3

FDA submissions, and both knew how important LeadCare Ultra's market success was to Magellan's private equity owners, who had tasked Winslow and Maleknia with positioning Magellan for sale.

### Discovery of the malfunction (June 2013)

In January 2013, the FDA put Magellan's LeadCare Ultra 510(k) application on hold and requested additional studies, including studies about how the device performed under different temperature and humidity conditions. In June 2013, while performing the FDA-requested studies, Magellan discovered a malfunction[2] affecting the LeadCare Ultra device that caused blood lead test values to be lower than actual values under certain conditions (the "malfunction" or "incubation issue"). Specifically, lead values tended to be lower than the reference standard when blood samples were tested immediately and would rise over time as the blood samples incubated in treatment reagent. These results were contrary to the device's label, which promised accurate results if the samples were tested immediately, without any incubation.

Daoust was one of the first employees to learn about the incubation issue. Daoust forwarded the study results to several others in the company via email with the subject line "HELP!" In the body of the email, Daoust said she was "very stressed" and was planning additional experiments to determine why this was happening. She also informed Winslow and Maleknia about the incubation issue the day after she received the unexpectedly and consistently low blood lead value results, but none of the defendants ever reported the results to the FDA. Instead, Magellan conceived a different temperature and humidity study, which did not contain any actual

---

[2] "***Malfunction*** means the failure of a device to meet its performance specifications or otherwise perform as intended. Performance specifications include all claims made in the labeling for the device. The intended performance of a device refers to the intended use for which the device is labeled or marketed, as defined in § 801.4 of this chapter." 21 C.F.R. § 803.3(k) (emphasis in original).

4

blood lead measurements, and reported those results to the FDA as part of the LeadCare Ultra 510(k) application. The FDA—unaware of the incubation issue—cleared LeadCare Ultra for marketing and distribution in August of 2013.

Earlier in 2013, Winslow had briefed Magellan's board of directors that getting LeadCare Ultra cleared and selling 35 units by year end was the company's number two goal for 2013. Although Winslow and Maleknia were frustrated by how long it took to get FDA clearance, and had planned to launch LeadCare Ultra soon after receiving that clearance, the company delayed the launch to conduct further testing of the incubation issue.

### *LeadCare Ultra launch (December 2013) and customer complaints (August 2014)*

Multiple tests confirmed the incubation issue and indicated that it also affected the already cleared and widely used LeadCare II device. The data from these studies indicated that LeadCare Ultra was not as accurate as the label represented when blood samples were tested immediately after mixing the sample and the reagent. Magellan scientists deemed the phenomenon reproducible, and Daoust informed senior management in September 2013 that the company would have to submit new data to the FDA, *i.e.*, file a new 510(k), if it was going to change the instructions for use to require incubation of samples before testing. All these facts were well known to the group of managers directly involved in this issue, including Daoust, as well as to Winslow and Maleknia, who regularly attended weekly meetings where the incubation issue was discussed.

Nevertheless, the defendants released LeadCare Ultra for sale to customers in December of 2013 even though they had not found the root cause of the problem and did not have an effective mitigation. The defendants did not notify potential customers or the FDA about the incubation issue prior to the release of LeadCare Ultra, nor did they notify the FDA or their LeadCare II

5

customers that the incubation issue also affected LeadCare II, which had been on the market since 2006.

In May and June 2014, Magellan scientists briefed the defendants on the fact that LeadCare Ultra was continuing to produce falsely low results when used to test the blood of battery workers, who are exposed to lead at work, and that there was therefore a high risk of false low results on patient samples. Again, the defendants did not notify the FDA or their customers about the incubation issue.

In August 2014, three LeadCare Ultra customers notified Magellan that they were getting false low results when they tested immediately but that the lead values went up over time. In other words, the customers were complaining that they were seeing the incubation issue that the defendants first observed in June of 2013. An email from Daoust to a Magellan Product Specialist about the first customer complaint said, "Here we go again...please call a meeting together so we can discuss this. This is what we were afraid of." Nevertheless, in communications with the complaining customers, Daoust and others at Magellan acted as if this was new information, thereby falsely suggesting to customers that the company had not been aware of the incubation issue prior to product release.

Within days of receiving the first LeadCare Ultra complaint, Magellan filed a special 510(k) seeking clearance for a slightly smaller version of the device, which was called LeadCare Plus. The LeadCare Plus application presented data purporting to show clinical equivalence to LeadCare Ultra, with comparisons to the reference standard, but made no mention of the incubation issue, which at that point had been confirmed by LeadCare Ultra customers. Daoust made the filing. Later, well into the application process, Magellan changed the label for LeadCare

6

Plus to require 24-hour incubation (as discussed further below in relation to LeadCare Ultra) but did not draw the FDA's attention to the change, which the FDA apparently did not notice.

Continuing through October 2014, Magellan received similar complaints from other LeadCare Ultra customers, who reported inaccurate lead test results, test results that were significantly lower than expected, and false lows below CDC's medical thresholds when the samples were tested immediately.

Medical device manufacturers such as Magellan are required to file a Medical Device Report (MDR)[3] with the FDA within 30 days of receiving any complaint of a malfunction that would be likely to cause or contribute to serious injury or death if it recurred. 21 CFR Part 803. Magellan's practice was to file an MDR relating to any false low reading reported by a customer.

Rather than file an MDR after the first LeadCare Ultra complaint, however, the defendants ordered further internal tests, which confirmed the malfunction and indicated that incubating (*i.e.*, letting the blood sample/treatment reagent mixture rest) for at least 24 hours before testing was necessary to produce accurate results, but even that lengthy period of incubation did not solve the problem in all cases.

### LeadCare Ultra customer letter (November 2014)

On November 24, 2014, Magellan's Marketing Director sent LeadCare Ultra customers a letter about the malfunction, which was drafted by Daoust, edited by Winslow, and approved by Maleknia. The letter contained several false and misleading statements that misrepresented the frequency of the incubation issue and when Magellan discovered it. For instance, the letter said

---

[3] An MDR is one of the postmarket surveillance tools the FDA uses to monitor device performance, detect potential device-related safety issues, and contribute to benefit-risk assessments of these products. *See* https://www.fda.gov/medical-devices/medical-device-safety/medical-device-reporting-mdr-how-report-medical-device-problems (last accessed on January 30, 2025).

Magellan had "recently"[4] identified cases in which LeadCare Ultra underestimated the lead value when blood samples were tested immediately after mixing the sample and reagent. The letter said this was an "infrequent occurrence" which could impact a "small percentage of patient samples." Magellan also said it "did not observe [this phenomenon in its] clinical studies prior to product release." Each of these statements was false or misleading and designed to lull Magellan's customers into continuing to purchase/use the company's LeadCare devices.

The November 2014 letter also advised customers to incubate the blood sample/treatment reagent mixture for 24 hours before running the test—a significant change to LeadCare Ultra's product label, which allowed immediate testing upon mixing the blood sample and treatment reagent. The FDA later found that Magellan's own studies did not support the claim that the 24-hour incubation period sufficiently mitigated the problem.

The defendants did not notify the FDA about the malfunction when they sent the customer letter, nor did they obtain FDA approval for the change of instructions. Medical device manufacturers are required by law to obtain advance approval from the FDA and to file a notice of correction when they make changes such as this.

### *Significantly late filing of the LeadCare Ultra MDR (April 2015)*

Winslow and Maleknia wanted to reduce the 24-hour incubation time, because they knew it was a drawback for customers, so they hired an outside statistician in the hope that a statistical analysis would support a shorter incubation time. Magellan scientists sent the statistician the data from the fall of 2014, but Winslow told the scientists not to give the statistician more recent studies, ordered by Winslow and Maleknia, that showed a significant percentage of samples where the lead signal did not recover even after 24 hours of incubation in both LeadCare Ultra and LeadCare II.

---

[4] Winslow was the one who suggested adding "recently."

After reviewing the data, the statistician told Magellan that if they did not notify the FDA of the malfunction, he would do so himself.

The MDR Magellan submitted to the FDA in response was false and misleading in several ways. First, like the November 2014 customer letter, the MDR concealed the severity and prevalence of the malfunction and when Magellan first learned of it, claiming the company became aware of the issue when customers complained in August 2014. Second, the MDR misrepresented the reason for the late submission, saying new data indicated that the malfunction was occurring more frequently when that was not true. Third, the MDR misrepresented the number of complaining customers. And fourth, the MDR falsely represented that 24 hours' incubation was a complete mitigation for the malfunction.[5]

### *Discovery of possible root cause (Summer 2015)*

After filing the LeadCare Ultra MDR, Magellan continued to investigate the root cause of the incubation issue, motivated in part by the fact that Magellan's private equity owners had been trying to sell the company for years, and the issue was an obstacle to doing so. Winslow, Maleknia, and other senior managers stood to earn substantial bonuses if the company sold.

In late spring 2015, Magellan senior R&D scientist Susan Garramone was closing in on a root cause explanation: interference with the lead signal caused by a substance in the rubber stopper in a commonly used test tube made by Becton Dickinson (BD). Garramone was about to

---

[5] The FDA received hundreds of thousands of MDRs in 2015, and this MDR did not receive sufficient attention for various reasons. As a result, the FDA did not follow up with Magellan at the time. *See, e.g.*, https://www.fda.gov/medical-devices/medical-device-safety/medical-device-reporting-mdr-how-report-medical-device-problems (last accessed on January 30, 2025) ("[A]lthough MDRs are a valuable source of information, this passive surveillance system has limitations. The incidence, prevalence, or cause of an event cannot be determined from this reporting system alone due to under-reporting of events, inaccuracies in reports, lack of verification that the device caused the reported event, and lack of information about frequency of device use.").

start a study relating to the incubation issue in LeadCare II when Winslow made a rare appearance in her office and directed her not to do the study, saying the company needed "plausible deniability." Both Winslow and Maleknia had indicated on several occasions going back to 2013 that they did not want Magellan's scientists to test LeadCare II for the incubation issue. Garramone left the company a short time later, in large part because of concerns about how senior management was handling the incubation issue.

Before leaving the company, Garramone did extensive testing on different test tubes and found a different but potentially serious issue with another manufacturer's test tubes, sold under the Vacuette brand name. The lead signal in the Vacuette tubes was initially accurate or high, but after 48 hours of incubation, the signal went down, precipitously in the case of higher lead concentrations, which the company came to refer to as the Vacuette "cliff" effect. All the defendants were aware of this problem with the Vacuette tubes, yet they never told their customers or the FDA about this issue. Nor did the company disclose internal studies showing consistently inaccurate results with test tubes using the anticoagulant heparin, of which the defendants were all aware.

### *Change to LeadCare Ultra label (August 2015)*

The defendants did not change the LeadCare Ultra package insert, or label, which permitted immediate testing, when they sent the customer letter in November 2014, or even when they filed the MDR in April 2015. Thus, customers were still permitted to ignore the company's "advice" to incubate for 24 hours, and Magellan was aware that some customers were doing so.

It was not until August 2015 that the company changed the LeadCare Ultra label to require 24 hours' incubation. The company did not, however, seek clearance from the FDA before doing so, as Daoust had warned in 2013 would be required.

Instead, Daoust helped create a false internal paper trail suggesting that the company overlooked this step. The internal documentation forms, called Engineering Change Orders or ECO's, contained a decision tree designed to flag the need for FDA clearance for certain label changes. Daoust needed the signature of Magellan R&D Manager Rosemary Feeney on the form for the LeadCare Ultra label change. Daoust gave Feeney a form that had pre-checked the box for changes that do not require FDA clearance. Feeney crossed out that check mark and checked the box pertaining to changes requiring FDA clearance. Nevertheless, when Daoust received the form back from Feeney, she changed the pre-checked box back (*i.e.*, to indicate that FDA clearance was not required), and the company never sought FDA approval for the label change.

### Sale of Magellan to Meridian Bioscience (March 2016)

In the summer of 2015, private-equity-owned Magellan engaged an investment bank with intent to sell the company. Magellan's board of directors tasked Winslow and Maleknia with increasing Magellan's value to better position the company for sale—by expanding its LeadCare product line, enlarging its market share for LeadCare II, and developing new blood testing devices—and linked their performance to lucrative financial incentives.

In March 2016, Meridian Bioscience, Inc., acquired Magellan for $66 million, a substantially higher figure than had previously been offered for the company. During the due diligence process, Winslow and Maleknia disclosed the LeadCare Ultra MDR but did not provide or explain other information from which Meridian could have concluded that the MDR was false and misleading, including the fact that Magellan had been aware of the incubation issue since before it launched the product in 2013. Magellan also said nothing about the fact that it had found the same incubation issue in LeadCare II. In connection with the sale, Winslow and Maleknia received bonuses of approximately $2 million and $448,000, respectively.

### *Significantly late notification to FDA about LeadCare II malfunction (November 2016)*

In November 2016, after the sale to Meridian, over three years after the defendants first discovered the incubation issue in LeadCare II, and more than two years after conducting additional internal studies that confirmed the incubation issue in both LeadCare II and LeadCare Ultra, the defendants finally notified the FDA and some customers that the malfunction also impacted LeadCare II. In doing so, however, they made false and misleading statements about when they discovered the problem in LeadCare II. Daoust authored a cover letter and MDR falsely stating that LeadCare II did not originally exhibit the incubation issue, and that it was only after Magellan identified the likely root cause of the problem in LeadCare Ultra that it checked to see if LeadCare II was also impacted.

### *Recall of the LeadCare devices (May 2017)*

In March 2017, Magellan filed a special 510(k) application for FDA approval to change the labels for LeadCare Ultra and LeadCare Plus to allow customers to test the blood-reagent mixture after either 24 hours of incubation or just one hour of incubation if the sample was heated to 60° C. The application triggered urgent questions from the FDA about the incubation issue and its effect on the accuracy and safety of Magellan's LeadCare devices.

The FDA was particularly focused on when Magellan first discovered the incubation issue, because the date of discovery determined the number of patients who could have received inaccurate test results. During an April 20, 2017 conference call, an FDA official asked Magellan representatives when the company first discovered the issue. Daoust was a disclosed participant and Maleknia was an undisclosed participant in this call.

Based on input from Daoust and Maleknia before the call, a Magellan consultant falsely told the FDA that Magellan had first discovered the incubation issue in late 2014 after receiving

customer complaints. Neither Daoust nor Maleknia did anything to correct this false statement. Winslow was immediately notified about the call, including the FDA's inquiry as to the timing of Magellan's discovery of the incubation issue and the consultant's false response, and she too did nothing to correct this false statement.

Magellan also prepared and submitted to the FDA a timeline of the incubation issue that falsely stated that the company first identified the issue in 2014. Winslow personally edited this timeline and made a minor editorial comment on the entry with the false issue-identification date. The FDA relied on these representations when it issued its press release about the recall, which stated that Magellan first recognized potential problems with the performance of LeadCare Ultra in August 2014.

Daoust and other Magellan employees also falsely told the FDA that only certain BD test tubes showed lead suppression, thus further concealing the Vacuette "cliff" issue. After the recall was announced, the company made the same misrepresentation to certain customers.

In early May 2017, Magellan's outside regulatory consultant, who had been kept in the dark about the company's 2013 incubation studies, learned about those studies and asked how the company could reconcile the results with the statements they had made to the FDA that the company first learned about the incubation issue from complaining customers. Winslow gave a false answer to the consultant about the reason for the 2013 studies and did not direct that Magellan correct its misstatements to the FDA.

The FDA ultimately found that Magellan's own data showed that the LeadCare devices could not accurately measure lead levels in blood samples drawn from a vein, regardless of the recommended incubation times. In May 2017, the FDA recommended a Class I recall—the most

serious recall—of all LeadCare devices using venous samples and warned the public not to use them for venous samples because of the malfunction.[6]

The FDA conducted a for-cause inspection of Magellan in the summer of 2017 and issued a Form 483 statement of violations of the Food, Drug, and Cosmetic Act and a warning letter. In the company's response to the warning letter, Winslow did not dispute any of the findings but blamed the noncompliance on poor regulatory advice and reported that Daoust had been replaced.

Shortly after the FDA announced the recall, 12 U.S. senators signed a letter calling on the heads of FDA and CDC to investigate the issue. In July 2017, Winslow briefed several groups of staffers on Capitol Hill about the incubation issue and repeated the false statement that the company first learned of the issue in 2014. She also falsely told the staffers that Magellan's studies had shown that LeadCare II capillary samples did not exhibit the incubation issue.

Between the time the defendants discovered the malfunction and the time the FDA recommended the Class I recall, Magellan earned approximately $10,900,000 from the sale of LeadCare Ultra, LeadCare Plus, and LeadCare II devices and test kits to customers that used the devices to test venous samples. In addition, the CDC and FDA estimated that the malfunction caused thousands of children and adults to receive inaccurate blood lead test results.

---

[6] The recall was limited to venous samples because Magellan told the FDA that the company's studies showed the malfunction did not occur in capillary (fingerstick) samples.