UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
UNITED STATES OF AMERICA      )
)
        v.            )     Case No. 23-cr-10094-1-PBS
)
AMY WINSLOW,         )
)
     Defendant     )
_____ )

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in connection with the sentencing of defendant Amy Winslow. For the reasons set forth below, the government recommends that the Court impose the following sentence: incarceration for 12 months and one day, 12 months of supervised release, and a fine of $10,000, in addition to the mandatory special assessment of $100.

## I.    INTRODUCTION

The defendant knowingly and intentionally misled the FDA about a medical device malfunction that the CDC and FDA estimated caused thousands of children and adults to receive inaccurate blood lead level test results. Regardless of the root cause of the malfunction, Winslow knew the risk it presented. She knew patients might receive false low results below the CDC's thresholds for intervention, when their actual blood lead levels met or surpassed those thresholds. She knew this could potentially result in a lack of intervention to prevent further lead exposure or, worse, to provide critical care in the case of lead poisoning—a major, preventable problem in the United States that can result in serious, life-threatening medical conditions. Nevertheless, Winslow—a senior corporate executive with responsibilities not only to her employer but also to the FDA and the American public—consistently chose to put corporate profits, and her own job security and personal financial gain, before patient safety.

Rather than own up to her crime, however, and notwithstanding her guilty plea, Winslow has continually sought to avoid the consequences of her actions, including by denying the essential facts underlying her offense of conviction. Not only was she extremely slow to (purportedly) accept responsibility, pleading guilty just before trial, but she has demonstrated a complete lack of accountability, much less remorse. This is a troubling pattern that suggests a failure to understand the serious nature of the offense. It also reflects a remarkable degree of self-entitlement.

The defendant chose to assume the special duties imposed on the manufacturers of medical devices that pose potential public health risks. *See United States v. Park*, 421 U.S. 658, 672 (1975) ("The requirements of foresight and vigilance imposed . . . are no more stringent than the public has a right to expect of those who voluntarily assume positions of authority in business enterprises whose services and products affect the health and well-being of the public that supports them."). She violated those duties and now minimizes her role in doing so, shifting blame to others—even attempting to blame the agency she actively misled—and denying the very real risk to public health posed by the device malfunction she helped conceal. Simply put, Winslow took advantage of the opportunity to plead guilty to a single count of the Indictment, and the government's favorable sentencing recommendation, only to continue claiming that she did nothing wrong.

The Court should hold the defendant accountable for her actions and the systemic harm they caused. This case presents the Court with the opportunity to assure the general public that health care executives who imperil the vital functions of regulatory agencies tasked with protecting patient health and safety will face serious consequences, and not only in the form of financial penalties. The imposition of a prison sentence here is critically important. It is the only meaningful sanction for this type of crime. The alternatives—probation, a fine, home confinement—are woefully inadequate. Nor is the fact of prosecution itself a sufficient sanction. White-collar

defendants frequently argue that they have "suffered enough already" because of the (often very real) collateral consequences of prosecution. To accept this argument would be to treat white-collar offenders more leniently, severely undermining faith in the fair and equal administration of justice. The term of incarceration the government is requesting—12 months and one day—would avoid this pernicious effect. It would properly reflect the seriousness of Winslow's offense, promote respect for the law, provide just punishment, and serve to deter others from engaging in similar conduct. The government does not take its responsibility to recommend an appropriate sentence lightly and firmly believes that its recommendation here is not only fair, but no more than necessary to see justice done.

## II.      THE OFFENSE AND RELEVANT CONDUCT

Magellan Diagnostics, Inc. ("Magellan" or the "Company") is the nation's leading manufacturer of medical devices for testing blood lead levels. PSR ¶ 12. Accurate blood lead level testing is a critical part of lead poisoning prevention efforts, especially with respect to children who are particularly susceptible to the effects of lead. *Id.* ¶ 14. Magellan's devices include LeadCare II, LeadCare Ultra, and LeadCare Plus; LeadCare II is a point-of-care device used primarily in non-laboratory settings such as doctors' offices and clinics, whereas LeadCare Ultra and LeadCare Plus were designed for use at hospitals and labs. *Id.* ¶ 12. *See also* Dkt. No. 1, Indictment ("Ind."), ¶¶ 19–21. Winslow was Magellan's President from 2011 to 2018 and also served as the Company's Chief Executive Officer from 2013 to 2018. PSR ¶ 16.

Beginning in November 2012, Magellan sought clearance from the FDA to market its newly developed LeadCare Ultra device, which was intended for high-volume laboratory use. PSR ¶ 17. Winslow was involved in the clearance process and understood how important LeadCare Ultra's market success was to Magellan's private equity owners, who had tasked Winslow and co-

defendant Hossein Maleknia, Magellan's Chief Operating Officer and Vice President of Operations, with positioning the Company for sale. *Id.*

In June 2013, while conducting FDA-requested studies in connection with the LeadCare Ultra clearance process, Magellan identified an issue which, in certain circumstances, tended to result in lower blood lead levels when a blood sample was tested shortly after it was mixed with treatment reagent and higher blood lead levels when the blood sample-treatment reagent mixture was tested after sitting, or "incubating," for a period of hours or days (the "malfunction"[1] or "incubation issue").[2] PSR ¶ 18. These results were contrary to LeadCare Ultra's label and instructions for use, which promised accurate results with immediate testing upon mixing the blood sample and treatment reagent (*i.e.*, no incubation period required). *Id.*

Magellan's Manager and Director of Quality Assurance and Regulatory Affairs, co-defendant Reba Daoust, informed Winslow (and Maleknia) of the study results, but neither the defendant nor any other Magellan employee notified the FDA about the incubation issue during the LeadCare Ultra clearance process. PSR ¶ 19. The FDA—unaware of the issue—cleared LeadCare Ultra in August 2013, and Magellan released the device for sale in December 2013. *Id.* ¶¶ 19, 22. Between the time of FDA clearance and Magellan's release of the device, multiple

---

[1] FDA regulations define "malfunction" as "the failure of a device to meet its performance specifications or otherwise perform as intended." 21 C.F.R. § 803.3(k). "Performance specifications include all claims made in the labeling for the device." *Id.* "The intended performance of a device refers to the intended use for which the device is labeled or marketed." *Id.*

[2] Each of the LeadCare devices works by collecting a blood sample—either from a vein, known as a venous test, or through a finger-stick, known as a capillary test—and mixing the sample with a chemical, called a treatment reagent, that separates lead from red blood cells so that it can be detected. That mixture is placed onto a sensor that goes into the Magellan device for a blood lead level reading.

studies confirmed the incubation issue. *Id.* ¶ 21.[3] The Company's senior management team, including Winslow, was aware of these studies[4] and was also aware that changing LeadCare Ultra's label and instructions for use to require an incubation period would necessitate a new application to the FDA. *Id.* Rather than do that, Magellan opted to release LeadCare Ultra for sale with the label and instructions for use that allowed for immediate testing, and without notifying the FDA or customers of the malfunction. *Id.* ¶ 22.

In August 2014, multiple LeadCare Ultra customers complained to Magellan that they were observing unexpectedly low results when they tested blood samples immediately after mixing them with treatment reagent. PSR ¶ 24.[5] Magellan received similar complaints from other LeadCare Ultra customers through October 2014. *Id.* ¶ 26. Winslow was aware of these customer complaints, but neither she nor any other Magellan employee notified the FDA, even though

---

[3] These studies indicated that the incubation issue also affected Magellan's LeadCare II device—which had been on the market since 2006 and was widely used for point-of-care testing—when used to test venous samples. PSR ¶ 21.

[4] While an early study suggested that the issue might have been caused by bulk treatment reagent, which was not intended for customer use, another study in September 2013, and subsequent 2013 studies, confirmed that the malfunction occurred with the kind of treatment reagent customers would be using. Further, in May and June 2014, after the release of LeadCare Ultra, Magellan scientists briefed Winslow and others on studies showing that the device was continuing to produce inaccurately low results when used to test the blood of battery workers (who are exposed to lead at work), and that there was therefore a significant risk of inaccurate results with patient samples. PSR ¶ 23. Still, no one at Magellan notified the FDA or customers of the malfunction. *Id.*

[5] Within days of receiving the first LeadCare Ultra customer complaint, Magellan filed an application for FDA clearance of its LeadCare Plus device (a slightly smaller version of LeadCare Ultra intended for small-volume lab use). PSR ¶ 25. The application presented data purporting to show clinical equivalence to LeadCare Ultra but made no mention of the incubation issue, which at that point had been confirmed by LeadCare Ultra customers. *Id.* Later, well into the application process, Magellan changed the label for LeadCare Plus to require 24-hour incubation (as discussed further below in relation to LeadCare Ultra) but did not draw the FDA's attention to the change, which the FDA apparently did not notice. *Id.*

medical device manufacturers are required to submit a medical device report ("MDR")[6] within 30 days of becoming aware of a device malfunction likely to cause or contribute to serious injury or death if it recurred. *Id.* ¶¶ 27–28. Instead, in November 2014, Magellan sent LeadCare Ultra customers a letter advising them to allow the blood sample-treatment reagent mixture to incubate for a minimum of 24 hours before testing, which contradicted the device's label and instructions for use, even though the Company's studies had shown that 24-hour incubation did not fully mitigate the problem. *Id.* ¶¶ 28–30. The letter, which Winslow edited, contained misleading statements and omissions regarding the malfunction and when Magellan discovered it. *Id.* ¶ 29. Neither Winslow nor any other Magellan employee notified the FDA of the malfunction when the Company sent the customer letter, or of the letter's change to LeadCare Ultra's user instructions— a change that cannot be made without FDA approval. *Id.* ¶ 31.

In April 2015—after an outside consultant hired to conduct a statistical analysis of the incubation issue told Magellan that if the Company did not notify the FDA of the issue, he would do so himself—Magellan finally submitted an MDR to the FDA reporting the malfunction in LeadCare Ultra. PSR ¶¶ 32–33. In the MDR, Magellan claimed that it first became aware of the issue when customers complained in August 2014, and that the reason it was reporting the malfunction at that point was because new data had indicated that the malfunction was occurring more frequently. *Id.* ¶ 33. The MDR also misrepresented the number of complaining customers and falsely stated that 24 hours' incubation was a complete mitigation for the malfunction. *Id.*[7]

---

[6] MDRs are one of the post-market surveillance tools the FDA uses to monitor medical device performance, detect potential device-related safety issues, and contribute to benefit-risk assessments of such devices.

[7] In November 2016, Magellan submitted an amendment to the LeadCare Ultra MDR notifying the FDA that the incubation issue also affected LeadCare II when used to test venous

Several months later, in August 2015, Magellan changed the LeadCare Ultra label to incorporate the 24-hour incubation instruction the Company had previously provided to customers in the November 2014 letter. PSR ¶ 38. However, Magellan did not notify the FDA 90 days prior to making the label change, and did not file a notice of correction with the FDA, as required. *Id.*

Around the same time, in the summer of 2015, Magellan engaged an investment bank with intent to sell the Company. PSR ¶ 40. Magellan's board of directors tasked Winslow and Maleknia with increasing the Company's value to better position it for sale and linked their performance to lucrative financial incentives. *Id.* In March 2016, Meridian Bioscience, Inc. ("Meridian") acquired Magellan for $66 million. *Id.* ¶ 41. In connection with the sale, Winslow received a bonus of approximately $2 million. *Id.*

In March 2017, Magellan filed an application for FDA approval of a change to the labels for LeadCare Ultra and LeadCare Plus related to the incubation issue—specifically, a change to the user instructions to allow customers to test the blood sample-treatment reagent mixture after *either* 24 hours of incubation *or* just one hour of incubation if heated to 60° C. PSR ¶ 43. The application triggered urgent questions from the FDA about the incubation issue and its effect on the accuracy and safety of Magellan's LeadCare devices. *Id.* The FDA ultimately found that Magellan's own data showed that the Company's devices could not accurately measure lead levels in venous blood samples, regardless of the recommended incubation time. *Id.* ¶ 49. In May 2017, the FDA recommended a recall of all LeadCare devices using venous samples and warned the public not to use the devices for venous testing because of the malfunction. *Id.* The CDC and FDA

---

samples. PSR ¶ 42. The Company did not disclose to the FDA that it had become aware of the impact on LeadCare II years earlier. *Id.*

estimated that the malfunction caused thousands of children and adults to receive inaccurate blood lead level test results. *Id.* ¶ 53.[8]

## III.    THE SENTENCING GUIDELINE RANGE

Pursuant to the calculation set forth below, Winslow's total offense level under the Sentencing Guidelines is 29, which, based on a criminal history score of zero and resulting criminal history category I (*see* PSR ¶ 107), yields a guideline imprisonment range of 87 to 108 months:

- Base offense level of six (USSG §§ 2N2.1(c), 2B1.1(a)(2));

- Increase of 18 because the loss attributable to the offense is more than $3.5 million but not more than $9.5 million (USSG § 2B1.1(b)(1)(J));

- Increase of two because the offense involved ten or more victims (USSG § 2B1.1(b)(2)(A)(i));

- Increase of two because the offense involved the conscious or reckless risk of death or serious bodily injury (USSG § 2B1.1(b)(16)(A));

- Increase of four based on the defendant's aggravating role in the offense (USSG § 3B1.1(a))[9]; and

- Decrease of three for acceptance of responsibility (USSG § 3E1.1).[10]

---

[8] There is no dispute that the root cause of the incubation issue was ultimately identified as interference with the lead signal caused by a substance in the rubber stopper in a commonly used test tube made by Becton Dickinson. *See* PSR ¶¶ 35, 56.

[9] Because, in the government's view, an aggravating role adjustment applies under § 3B1.1, Winslow does not meet the criteria for the zero-point offender adjustment. *See* USSG § 4C1.1(a)(10).

[10] While this calculation includes an adjustment for acceptance of responsibility, as noted above and discussed further below, the government questions whether the defendant has fully accepted responsibility for her criminal conduct. The fact that she pled guilty does not in and of itself entitle her to a reduction for acceptance of responsibility. *See United States v. Muriel*, 111 F.3d 975, 982 (1st Cir. 1997) ("A defendant who pleads guilty is not entitled to a downward adjustment for acceptance of responsibility as a matter of right."). Where a defendant "has resorted to half-truths or evasions from the truth in an effort to minimize his or her culpability," courts have the discretion to deny the reduction. *Id.* at 982–83. *See also United States v. Gadson*, 77 F.4th 16, 22–23 (1st Cir. 2023) (no clear error in district court's denial of reduction for acceptance of

Because the statutory maximum term of imprisonment for the offense of conviction (three years) falls below the low end of the otherwise applicable guideline sentencing range, the guideline term of imprisonment is 36 months. *See* USSG § 5G1.1(a).

While the Probation Office has concluded, consistent with the Court's ruling (*see* Dkt. No. 324), that the defendant's offense involved fraud and that § 2B1.1 therefore applies, the guideline calculation set forth in the PSR does not include enhancements for ten or more victims, conscious or reckless risk of death or serious bodily injury, or aggravating role.[11] Probation's calculation includes an increase based on the loss attributable to the offense (albeit under a different theory than that advocated by the government, as discussed further below) of 20 levels, as opposed to the 18-level increase the government agreed to in the parties' plea agreement.[12] This results in a total offense level of 21 and a guideline imprisonment range of 37 to 46 months. Because this too

---

responsibility where defendant pled guilty well in advance of trial but disputed his role in the scheme).

[11] Because the Probation Office has declined to apply an aggravating role adjustment, the guideline calculation set forth in the PSR includes the two-level reduction applicable to certain zero-point offenders under § 4C1.1.

[12] As discussed further below, the PSR concludes that the loss amount, considering all charged/relevant conduct, "is the amount paid for all devices during the scheme," which, here, is "approximately $10,900,000 collected in sales of LeadCare Ultra, LeadCare Plus, and LeadCare II devices and test kits." PSR ¶¶ 84, 93. In Winslow's plea agreement, the government calculated the loss amount based strictly on the count of conviction (Count Six of the Indictment), which pertains only to the LeadCare Ultra device, without taking into account relevant conduct. *See* Dkt. No. 282 at 2 (increasing the defendant's offense level by 18 because the loss attributable to the offense is more than $3,500,000 but not more than $9,500,000, based on the LeadCare Ultra sales figure of $6,510,000).

exceeds the statutory maximum, the guideline term of imprisonment under Probation's calculation is likewise 36 months.[13]

The defendant maintains her disagreement with the Court's ruling that § 2B1.1 applies to her offense of conviction. The Court has already denied the defense's motion for reconsideration of that ruling, *see* Dkt. No. 344, and there is no reason to revisit the Court's decision or the reasoning underlying it. In her objections to the PSR, Winslow contends that even under § 2B1.1, no loss-based enhancement should apply. For the reasons set forth below, the Court should reject this argument and adopt the government's guideline calculation, including the enhancements Probation has declined to apply. Regardless of how the Court ultimately rules with respect to the specific offense characteristics at issue, however, the guideline sentence is no less than 36 months, which well exceeds the government's 12-month recommendation.

A.      **Loss**

The Probation Office has—in the government's view, incorrectly—concluded that "[d]espite the offense involving fraud . . . no loss should be applied." PSR ¶ 84. Notwithstanding this conclusion, Probation's guideline calculation includes a 20-level increase pursuant to one of the "special rules" for determining loss set forth in Application Note 3E to § 2B1.1. Specifically, the PSR relies upon the special rule used to assist in determining loss "[i]n a case involving a scheme in which . . . goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud[.]" USSG § 2B1.1, comment. n.3(E)(v)(III). In such cases, "loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services." *Id.* Here,

---

[13] The fine range for the defendant's offense—whether the total offense level is 29 as calculated by the government or 21 as calculated by Probation—is also capped at the statutory maximum of $10,000. *See* PSR ¶ 148; USSG § 5E1.2(2).

Probation has determined that amount to be "the amount paid for all devices during the scheme," which is "approximately $10,900,000 collected in sales of LeadCare Ultra, LeadCare Plus, and LeadCare II devices and test kits." PSR ¶¶ 84, 93.

"Loss" under § 2B1.1(b)(1) refers to any reasonably foreseeable pecuniary harm resulting from the offense.[14] While there are various victims of the defendant's offense—the FDA, Magellan's customers (purchasers/users of the defective LeadCare devices), and patients (whose blood lead levels were tested using LeadCare devices and may have received inaccurate test results due to the incubation issue)—it was the customers who unquestionably sustained pecuniary harm.[15]

The Probation Office's conclusion to the contrary is simply mistaken. *See* PSR ¶ 84 ("in this case the consumers sustained no loss"). It rests on the faulty assumption that because the defective devices could still be used to test capillary blood samples, and/or because the devices could potentially function as intended if customers abided by the 24-hour incubation instruction, the customers sustained no loss. That is incorrect. The customers—particularly purchasers/users of the LeadCare Ultra and LeadCare Plus devices, which were designed and used primarily to test venous blood samples[16]—did not get the benefit of their bargain (*i.e.*, a device that could accurately

---

[14] This is the guideline definition of actual, as opposed to intended, loss. Intended loss is not at issue here. Further, while § 2B1.1(b)(1) instructs courts to use the gain that resulted from the offense as an alternative measure of loss where there is a loss but it reasonably cannot be determined, here the loss and gain amounts—what customers paid for, and Magellan earned from the sale of, defective LeadCare devices—are the same.

[15] Under § 2B1.1, a "victim" is any person who sustained actual loss (*i.e.*, pecuniary harm) or bodily injury as a result of the offense. *See* USSG § 2B1.1 comment. n.1.

[16] Magellan's own product materials show that the "predominant sample type" for LeadCare Ultra and LeadCare Plus is venous blood. *See* Trial Exhibit 537 (2017.07.11 Magellan Products USAO-00265290), attached hereto as Ex. 1.

test both venous and capillary blood samples according to the device's label and instructions for use, which allowed for immediate testing without any incubation period), and this is classic loss in economic fraud cases. *See, e.g., United States v. Cadden,* 965 F.3d 1, 32–33 (1st Cir. 2020) (a consumer who does not receive the benefit of their bargain, for instance by unwittingly purchasing a product of unknown safety or efficacy, has sustained actual loss, whereas a customer who got "exactly what he was told he was paying for" has not).

Simply put, Magellan's customers, particularly LeadCare Ultra and LeadCare Plus customers and customers that used LeadCare II for venous testing, would not have purchased the devices had they known about the incubation issue. The PSR acknowledges as much. *See* PSR Add. at 45 ("The Probation Office acknowledges that Magellan's customers were purchasing a potentially defective LeadCare device during the relevant time period and that had these customers known about the lead suppression issue, they would not have purchased the devices."). In fact, multiple LeadCare Ultra customers indicated that the devices were effectively worthless to them if they could not perform as intended. *See* Def. Obj. No. 26 (to PSR ¶ 37) (two LeadCare Ultra customers returned their devices because 24-hour incubation was not practicable in their labs); *see also* Trial Exhibit 163 (2014.10.28 Cincinnati Children's Hospital USAO-00315446), attached hereto as Ex. 2 (LeadCare Ultra customer complaining to Magellan that an incubation period of just 30 to 60 minutes would "greatly affect our workflows for the clinics we serve," stating: "We purchased these instruments so that we could run the samples STAT and provide results to clinicians immediately so that patient follow up can occur in clinic. We shared this information with [a Magellan representative] upon our interest in purchasing the instruments . . . this would not work with our work flow and could change our thoughts regarding using these instruments in our labs."). This clearly demonstrates that any Magellan customer that purchased a potentially

defective LeadCare device during the relevant time period sustained pecuniary harm. Here, the total loss (and gain) amount of approximately $10.9 million (for all conduct charged in the Indictment) is based on sales data—what customers paid for, and Magellan earned from the sale of, LeadCare Ultra ($6,510,000), LeadCare Plus ($490,000), and LeadCare II ($3,900,000) devices and test kits used to test venous samples. *See* PSR ¶ 53.[17] However, the government stands firm on its agreement to limit Winslow's loss amount to the $6,510,000 in LeadCare Ultra sales. *See* n.12, *supra*.

**B.    Ten or More Victims**

The Probation Office—after initially finding that "there are no identifiable victims" of the offense," Initial PSR ¶ 86—now acknowledges that the FDA and Magellan's customers are victims "for impact purposes," while maintaining that the customers sustained no loss. *See* PSR Add. at 47; PSR ¶ 86. That is incorrect for the reasons discussed above, and the enhancement for ten or more victims clearly applies. As reflected in the customer lists submitted to Probation (*see also* PSR ¶ 52), there were far more than ten customers that purchased a potentially defective LeadCare device during the relevant time period (and therefore sustained pecuniary harm), including 64 purchasers of the LeadCare Ultra device alone. Indeed, even if the Court were to consider as

---

[17] As set forth in the government's memorandum of law in support of its guidelines calculations, *United States v. Ihenacho*, 716 F.3d 266 (1st Cir. 2013)—which, like this case, involved a felony misbranding offense under 21 U.S.C. §§ 331 and 333(a)(2)—supports the government's position with respect to loss. *See* Dkt. No. 316 at 9–10. There, the First Circuit rejected the defense's argument that the district court erred in finding that the offense (which involved dispensing and shipping drugs to customers pursuant to invalid online prescriptions from an internet pharmacy business) caused loss within the meaning of § 2B1.1. Specifically, the First Circuit held that the customer victims did suffer a loss because they bought drugs "under the false belief that they were in full compliance with the law," and "from the record and the PSR, it [was] clear that many of these transactions would never have taken place in the absence of the fraud." *Ihenacho*, 716 F.3d at 277. The First Circuit also upheld the district court's use of gross proceeds to determine the loss amount. *See id.* at 279.

victims only the LeadCare Ultra customers that received (and confirmed receipt) of the November 2014 customer letter, that number (49) would still far exceed ten. The defendant's offense level should therefore be increased by two pursuant to § 2B1.1(b)(2)(A)(i).

### C.    Risk of Death or Serious Bodily Injury

A two-level increase applies under § 2B1.1(b)(16)(A) because the offense involved a conscious or reckless risk of death or serious bodily injury. The risks and harms associated with lead exposure and the importance of blood lead level testing are well established. It is undisputed, and Magellan's own labeling and marketing materials reflect, that prolonged exposure to lead and/or undetected lead poisoning can lead to serious bodily injury—including damage to the nervous, hematopoietic, endocrine, renal, and reproductive systems—and that high lead levels may cause coma, convulsions, and even death. Magellan's LeadCare devices are designed to detect lead in the blood so as to prevent prolonged lead exposure, lead poisoning, and the associated adverse health consequences.

The risk posed by the malfunction was obvious. Patients could have received false low blood lead level test results below the thresholds for intervention when their actual blood lead levels met or surpassed those thresholds, resulting in a lack of intervention to prevent further lead exposure or, worse, failure to provide critical care in the case of lead poisoning.[18] Such a lack of intervention could result in serious injury or death, which is why Magellan was required to report the incubation issue to the FDA. The Company's failure to do so—that is, to timely file the required

---

[18] It appears that the Probation Office has determined that the "risk of death or serious bodily injury" enhancement does not apply in part because of what the PSR characterizes as a dispute regarding whether the incubation period was a complete mitigation for the malfunction. There can be no real dispute, as the FDA considered and rejected Magellan's data regarding incubation as mitigation, finding it inadequate, which resulted in the recall of all LeadCare devices used to test venous samples.

MDRs, which must be submitted within 30 days of becoming aware of a device malfunction *likely to cause or contribute to serious injury or death*—is at the core of this case. Indeed, when Magellan finally did submit an MDR for LeadCare Ultra, the submission itself acknowledged this risk, stating as follows: "Underestimation of a blood lead result at immediate incubation times could indicate that a larger population of samples would appear to have lead levels below the medical decision point and possibly not be retested or treated . . . With this increased level of risk . . . Magellan is filing this MDR with FDA." *See* Trial Exhibit 267 (2015.04.02 LeadCare Ultra MDR USAO-02335416), attached hereto as Ex. 3. Simply by filing the MDR, the Company acknowledged that the malfunction was likely to cause or contribute to serious injury or death. If this does not establish applicability of the two-level increase for conscious or reckless risk of death or serious bodily injury, it is difficult to imagine what would.

### D.    Aggravating Role

The Court should also apply a four-level aggravating role adjustment pursuant to § 3B1.1(a). In the government's view, the offense conduct makes clear that Winslow was an organizer and leader of the offense, which involved five or more participants. The defendant's aggravating role is demonstrated not only by her leadership position at Magellan but also by her intimate involvement in the offense conduct and her decision-making authority over others. The Probation Office notes as examples instances in which Winslow provided instruction and direction to others with respect to the malfunction, but has declined to apply the adjustment, in part because of its view that Winslow does not appear more culpable than Maleknia. *See* PSR ¶ 97. But there can of course be more than one organizer/leader of an offense, and equally or comparably culpable co-defendants.

Both Winslow and Maleknia acted as organizers/leaders. For example, they exercised decision-making authority in determining: (1) how to handle internal tests and studies related to the malfunction (*see, e.g.*, Maleknia PSR ¶¶ 33, 36; Winslow PSR ¶¶ 32, 35); (2) how to respond to customer complaints about the incubation issue (*see* Maleknia PSR ¶ 30; Winslow PSR ¶ 29); (3) whether and how to make required regulatory filings with the FDA; and (4) how to respond to FDA inquiries regarding when Magellan first discovered the problem (*see* Maleknia PSR ¶¶ 45–46; Winslow PSR ¶¶ 45–46, 48). Moreover, Winslow and Maleknia stood to gain far more than the other employees involved, in the form of a substantial bonus when Magellan was acquired. Maleknia PSR ¶¶ 18, 35, 41–42; Winslow PSR ¶¶ 17, 34, 40–41.[19] Therefore, most of the factors set forth in Application Note 4 to § 3B1.1 (which include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others) weigh in favor of applying an aggravating role adjustment.

Further, in the final PSR for co-defendant Reba Daoust, the Probation Office has applied a minor role adjustment because of Daoust's lesser culpability as compared to Winslow and Maleknia, "who held higher positions of authority at Magellan," and because Daoust "did not stand to benefit from the criminal activity" (aside from maintained employment). Daoust PSR ¶ 95; PSR Add. at 46. This assessment of the dichotomy between Daoust on one hand and Winslow and

---

[19] As discussed further below, in her PSR objections, Winslow disputes that her $2 million bonus was in fact substantial. *See* Def. Obj. No. 23 (to PSR ¶ 34).

Maleknia on the other highlights why application of the aggravating role adjustment is appropriate here.

## IV.    THE GOVERNMENT'S SENTENCING RECOMMENDATION

The relevant factors under 18 U.S.C. § 3553(a) necessitate the imposition of a meaningful term of imprisonment in this case. Given the serious nature of the offense, the defendant's history, and the need for deterrence, among other considerations, the government's recommended sentence—incarceration well below the statutorily-capped guideline sentence of 36 months—is sufficient but not greater than necessary to achieve the goals of sentencing.

### A.    The Nature and Circumstances of the Offense Warrant a Meaningful Term of Imprisonment

The defendant's crime was one of deception, the goal of which was to prevent the FDA from carrying out its mission to protect public health and safety, all for the sake of corporate success and millions of dollars in personal profit. Winslow repeatedly chose to prioritize those aims over patient safety, all the while endeavoring to maintain "plausible deniability."[20] She knew that Magellan was required to report device malfunctions to the FDA. She also knew that any change to a device's label or instructions for use meant to mitigate the effects of such a malfunction required FDA notice and approval. She knew the reasons for those requirements, and she knew the risk posed by inaccurate blood lead level test results. Her failure to report the incubation issue affecting LeadCare Ultra and Magellan's change to the device's label and instructions for use meant to address that issue, at the time and in the form required by the FDA, was not just a knowing

---

[20] *See* PSR ¶ 35. Winslow denies this allegation, claiming that its only basis is unreliable grand jury testimony. *See* Def. Obj. No. 24 (to PSR ¶ 35). Not so. Contemporaneous emails between Magellan employees explicitly refer to Winslow's "plausible deniability strategy." *See* Trial Exhibit 571 (2017.07.24 R Morse to R Daoust Subject Re Fwd Magellan Diagnostics USAO-MAG-030165), attached hereto as Ex. 4 ("If any evidence of her plausible deniability strategy surfaces, I think the ship will finally sink!").

concealment of a material fact. It was a calculated strategy with a specific purpose: to prevent the FDA from exercising its regulatory authority and issuing a recall for the Company's LeadCare devices, which had a serious defect with no known cause or fix. Had the FDA known the whole truth in 2014, it would have done what it ultimately did in 2017: alert the public that Magellan's LeadCare devices could not be used safely with venous samples.

But of course, a product recall is bad for business—bad for the Company's bottom line and bad for Winslow, its President and CEO. Instead of doing the right thing, the defendant consistently chose profits, career advancement, and personal financial gain over patient safety, endangering the millions of children and adults who had their blood lead levels tested with Magellan devices. Remarkably, Winslow disputes that the $2 million bonus she received was substantial, even though it was over six times her annual salary at the time, and more money than most can fathom. *See* Def. Obj. No. 23 (to PSR ¶ 34) (objecting to the characterization of Winslow's bonus as "substantial," asserting that she earned "a market-standard bonus . . . as is typical for executives in these types of transactions"). In fact, she disputes pretty much every fact contained in the PSR, maintaining her strategy of "plausible deniability" right through the time of sentencing. Her assertions are not credible. This was a serious crime, and there can be no doubt that it was motivated at least in part by greed. Had Winslow promptly and accurately reported the incubation issue, both she and Magellan stood to lose money. There was no other reason not to err on the side of caution, especially in dealing with a device that impacts the health and safety of children. The nature and circumstances of Winslow's offense necessitate a meaningful term of incarceration.

**B. The Defendant's History and Characteristics Weigh in Favor of the Government's Recommended Sentence**

The defendant's history and characteristics also support the government's sentencing recommendation. Winslow has had more advantages than the overwhelming majority of the

18

defendants who appear before this Court. She enjoyed a positive, middle-class upbringing in a loving household with close-knit family relationships that remain an important part of her life today. She is a highly successful, well-educated professional with an advanced degree from Harvard. She has held senior executive positions at multiple companies, earning six-figure salaries. She has accumulated what most would consider enormous wealth, with a net worth in the millions. She lives in a wealthy Boston suburb with her husband of 25 years, who also serves as a senior corporate executive. She is fortunate to have a large, positive social network of family, friends, and former colleagues. And at least until the time of her arrest, she was a respected member of her community.

These characteristics cut both ways. The defendant's achievements, law-abiding past, and standing in her community are mitigating factors in one sense, but they also underscore that she has enjoyed advantages and opportunities available only to a select few. Winslow knew better. Nevertheless, she engaged in criminal conduct to pile additional advantages—job stability, career success, and personal profit—atop those she already enjoyed. It is no answer that the defendant was simply trying to help her company succeed. *See* Def. Obj. No. 28 (to PSR ¶¶ 40–41) (asserting that "any executive of any company has a duty to that company to seek to improve the company's financial position and that it is commonplace for corporations to incentivize financial performance"). Presumably, all senior executives want to help their company succeed, yet most manage to steer clear of criminal shortcuts. The government is aware of no reasonable explanation for the defendant's conduct other than a sense of entitlement.

C.    **An Incarcerative Sentence Appropriately Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment and Adequate Deterrence**

The government's recommended sentence not only reflects the serious nature of the offense, but also promotes respect for the law and provides both just punishment and adequate deterrence. Defendants in white-collar cases are often subject to public scrutiny; some lose jobs or suffer other financial setbacks as a result of the charges against them. This case is no exception. But these collateral consequences must be put in perspective. Neither reputational harm nor adverse financial impact is an adequate substitute for meaningful punishment in white-collar cases. These consequences are both unexceptional and ephemeral; nearly all white-collar defendants face them, and many recover—both reputationally and financially—over time.

Accordingly, the First Circuit has said that "it is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also United States v. Stall*, 581 F.3d 276, 286 (6th Cir. 2009) ("We do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose."). Simply put, criminal defendants "with money or earning potential" should not be able to "buy their way out of jail." *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the desirability of minimizing "discrepancies between white- and blue-collar offenses"); *see also United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) ("[I]t has been noted that probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class.").

For these reasons, home confinement, probation, a criminal fine, or some combination thereof are not sufficient penalties, particularly in light of the systemic aspects of the defendant's crime—that is, that it corrupted a system on which the American government and public rely—and the potential harm flowing from it. Probation, even with a community service requirement, is too lenient and too easily co-opted for its "PR" value. A fine alone is meaningless here in light of the statutory maximum and the defendant's substantial wealth. Nor would home confinement be a meaningful punishment in this case, in part given the overall prosperity in which the defendant resides. Failure to sentence Winslow to prison would send the message "that would-be white collar criminals stand to lose . . . practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity."). Such a result would be profoundly unjust.[21]

---

[21] Indeed, the Sentencing Guidelines reflect the consensus that those convicted of economic crimes should not be able to avoid incarceration, even where those crimes are a defendant's first offense. The legislative history of the Sentencing Reform Act of 1984 indicates that one of the Act's goals was to rectify the serious problem that white-collar offenders were not being adequately punished. *See* S. REP. NO. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses."). As then-Judge Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white-collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. *To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement* for many white-collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

Moreover, in this case the need for general deterrence is especially significant. A sentence of incarceration will effectively deter similarly situated individuals from committing similar crimes, not least because the resolution of this case is likely to be publicly reported in the media. This is a heavily regulated industry, and health care executives will be paying close attention to the sentence imposed in this case. Courts recognize "the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense." *United States v. Martin*, 455 F.3d at 1240. The fact that perpetrators of fraud crimes are "rational, cool, and calculated," makes them "prime candidate[s] for general deterrence." *Id.* (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 WM. & MARY L. REV. 721, 724 (2005)) (internal quotation marks omitted).

The government recognizes that specific deterrence is less of a consideration than general deterrence in sentencing this defendant, who is unlikely to repeat the specific crime charged here. But that is true of many, if not most, white-collar defendants, and it does not necessarily mean they are unlikely to reoffend. Here, Winslow broke the law in the context of the FDA regulatory system. It could just as well have been tax fraud, insurance fraud, accounting fraud, or securities fraud. These are crimes that are, by their nature, easy to commit and difficult to detect. They occur quietly, in conference rooms, living rooms, and over the phone, and they are rationalized by those who commit them. This is underscored by Winslow's attempts to argue about and whittle away at the very core of the offense to which she pled guilty. Incarceration is the surest way to deter both this defendant and similarly situated individuals in the future. A prison sentence will make

---

Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 20–21 (1988) (emphasis added) (footnotes omitted).

unambiguously clear that everyone is accountable to the law regardless of status, and will deter others from taking illegal shortcuts to get ahead in the business world.

    **D.**    **The Need to Avoid Unwarranted Sentencing Disparities**

    A sentence of 12 months and one day will not create unwarranted sentencing disparities. The government's recommendation is appropriate considering the corporate resolution with Magellan, sentences imposed in comparable cases, and the JSIN data corresponding to Winslow's offense level.

    First, while Magellan pled guilty to misdemeanor rather than felony violations of the FDCA, the Company also entered into a deferred prosecution agreement ("DPA") with the government pursuant to which it admitted to felony charges, including conspiracy to commit wire fraud and conspiracy to defraud an agency of the United States, in violation of 18 U.S.C. § 1349 and § 371, respectively. *See United States v. Magellan Diagnostics, Inc.*, 24-cr-10146-PBS; *United States v. Magellan Diagnostics, Inc.*, 24-cr-10144-PBS. The Company also agreed to pay a $21.8 million fine, $10.9 million in forfeiture, and a minimum of $9.3 million to compensate patient victims. Under the terms of the DPA, Magellan is also subject to a monitorship for a period of two years. Critically, the Company not only cooperated extensively with the government's investigation but also fully accepted responsibility by agreeing to a comprehensive statement of facts (something Winslow has not done even as she stands before the Court for sentencing). The resolution with Magellan is consistent with the Department of Justice's corporate enforcement

policy[22] and comparable to other corporate resolutions in this District.[23] Further, resolution through a DPA avoids potential debarment, which is often triggered by a felony guilty plea and could have effectively rendered Magellan's devices unavailable to its customers—physicians' offices, clinics, hospitals, and labs. The corporate resolution here—through a deferred prosecution agreement with respect to felony charges, a guilty plea to misdemeanor charges, and substantial financial penalties—does not create an unwarranted sentencing disparity.

Second, while such comparisons are inherently imperfect given the case-specific circumstances that drive sentencing in each case, the government's recommendation is reasonable based on sentences imposed in similar cases, both in this District and nationwide. Notably, courts have imposed incarcerative sentences even in cases involving *misdemeanor* violations of the FDCA. For example, in 2011, four corporate executives received prison sentences ranging from five to nine months for committing a misdemeanor violation of the FDCA by distributing adulterated and misbranded devices (an unapproved medical-grade bone cement), notwithstanding the executives' assertions that they lacked knowledge of wrongdoing. *See United States v. Bohner*, No. 2:09-cr-403 (E.D. Pa. Dec. 13, 2011) (eight months); *United States v. Higgins*, No. 2:09-cr-403, 2011 WL 6088576, at *13–14 (E.D. Pa. Dec. 7, 2011) (nine months); *United States v. Huggins*,

---

[22] *See* 9-47.120, Criminal Division Corporate Enforcement and Voluntary Self-Disclosure Policy, updated May 12, 2025, *available at* https://www.justice.gov/criminal/media/1400031/dl?i nline (last visited October 22, 2025). The policy and principles in place at the time of the Magellan resolution in 2024 were largely consistent with this policy.

[23] As the Court knows, deferred prosecution agreements are common in corporate cases in this District and nationwide. For example, in *United States v. eBay, Inc.*, the company was charged with and entered into a deferred prosecution agreement with respect to two counts of stalking through interstate travel, two counts of stalking through electronic communications services, one count of witness tampering, and one count of obstruction of justice. *See* 24-cr-10003-PBS, Dkt. No. 3. The company was also ordered to pay a criminal penalty of $3 million. This Court sentenced an individual executive in that case to 57 months' imprisonment. *See United States v. Jim Baugh*, 20-cr-10263-PBS, Dkt. No. 235.

No. 2:09-cr-403 (E.D. Pa. Nov. 21, 2011) (nine months); *United States v. Walsh*, No. 2:09-cr-403 (E.D. Pa. Nov. 22, 2011) (five months). Similarly, in October 2020, the former CEO of a pharmaceutical company was sentenced to six months' imprisonment for the company's marketing of an opioid-based product, without direct involvement in the illegal acts. *See United States v. Thaxter*, 20-CR-00024, Dkt. No. 55 (W.D.V.A. Oct. 22, 2020); *see also, e.g., United States v. Quality Egg, LLC*, 99 F. Supp. 3d 920, 942–46 (N.D. Iowa 2015) (imposing three-month prison sentences based on responsible corporate officer liability for distribution of adulterated eggs without evidence of defendants' knowledge of the contaminated eggs), *aff'd United States v. DeCoster*, 828 F.3d 626, 631 (8th Cir. 2016). These cases are distinguishable from the instant case, where Winslow *chose* to deliberately mislead the FDA and has pled guilty to a felony offense.

Other sessions of this Court have sentenced individuals who, like this defendant, worked in the health care industry. These cases provide additional relevant data points, although they are not direct comparisons in that they involve different guidelines and recommendations. In any event, even in cases that did not involve a risk of patient harm, defendants have been sentenced to prison, as courts have recognized the seriousness of crimes impacting our health care system and the need for deterrence in the health care space. *See, e.g., United States v. Miguel Saravia*, No. 24-cr-10280-ADB, Dkt. No. 38 (defendant sentenced to 14 weeks' incarceration in connection with a scheme to defraud health care benefit programs by directing false billing for patient psychotherapy visits); *United States v. Jeffrey MacEachron*, 24-cr-10193-IT, Dkt. No. 25 (defendant with extenuating personal circumstances sentenced to three months' incarceration for causing insurance companies to reimburse business for physical therapy services that were not actually performed); *United States v. Gustavo Kinrys*, 20-cr-10307-DJC-1, Dkt. No. 270 (defendant sentenced to 99 months in prison in connection with billing Medicare and private insurers for millions of mental

health treatments he never provided and then obstructing the investigation). The need for general deterrence is even more important in this case, where the defendant's conduct placed the health of the American people at risk.

Finally, the relevant JSIN data is instructive here. The data in the PSR is based on a total offense level of 21. As set forth above, the government believes the correct offense level is significantly higher (29). But even at a level of 21, nearly all defendants—92 percent—received a sentence of imprisonment, with an average sentence of 27 months and a median of 28 months. Of defendants with an offense level of 29, 98 percent were sentenced to prison, with an average sentence of 61 months and a median of 60 months. As part of a negotiated resolution, the government is recommending significantly less time here. The JSIN data highlights the reasonableness of the government's position.

## CONCLUSION

Amy Winslow did not accidentally mislead the FDA. She is not a victim of other people's poor decisions. She purposely concealed a device malfunction for her own benefit. Her actions demonstrate a stunning indifference to patient safety. Every day, health care executives across the country make difficult choices—choices that affect their companies' bottom line and, ultimately, their own financial interests. Despite Winslow's education and background, she repeatedly abandoned her morals. She knew better. Respectfully, the Court simply cannot, considering all the § 3553(a) factors, sentence Winslow to anything other than a term of imprisonment. The Court should adopt the government's recommendation and impose a sentence of incarceration for 12 months and one day, 12 months of supervised release, and a fine of $10,000, in addition to the mandatory special assessment of $100. This is the lowest possible sentence that can provide just punishment for Winslow's conduct.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    /s/ Leslie A. Wright
LESLIE A. WRIGHT
MACKENZIE A. QUEENIN
Assistant United States Attorneys

### Certificate of Service

I hereby certify that this document was filed through the ECF system on October 22, 2025 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

By:    /s/ Leslie A. Wright
LESLIE A. WRIGHT
Assistant United States Attorney